SOUTHWELL COMBING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.*

Docket Nos. 53842, 54484. Filed May 29, 1958.

---

*This Findings of Fact and Opinion supersedes 28 T. C. 553 (1957).

*Edward C. Park, Esq.*, and *Charles C. Worth, Esq.*, for the petitioner.

*J. Frost Walker, Esq.*, for the respondent.

ARUNDELL, *Judge:* These consolidated proceedings involve deficiencies in income tax in the following amounts:

| Docket No. | Fiscal year ended June 30— | Deficiency |
|---|---|---|
| 53842 | 1948 | $38,990.08 |
| | 1949 | 28,640.41 |
| | 1950 | 35,223.12 |
| | 1951 | 44,121.57 |
| 54484 | 1952 | 39,103.68 |
| | 1953 | 48,741.52 |

The only issue is whether, as determined by respondent, the liquidation of petitioner's predecessor and the transfer of its assets to petitioner constituted a reorganization within the meaning of section 112 (g) (1) (D) of the 1939 Code, therefore requiring petitioner to use for depreciation purposes the same basis that those assets had in the hands of its predecessor.

Petitioner has conceded other issues raised by the pleadings.

This case was originally submitted on a fully stipulated set of facts in Boston, Massachusetts, on June 18, 1956. Our opinion was filed on May 29, 1957, and decisions entered in respondent's favor on May 31, 1957. Petitioner, on June 13, 1957, moved that the case be reconsidered. Oral argument on that motion was heard on August 21, 1957. That motion was granted and our prior decision vacated on November 19, 1957. Thereafter, further testimony was offered and additional briefs filed.

### FINDINGS OF FACT.

The stipulated facts are so found and are incorporated herein by this reference.

During the years in issue, the Southwell Combing Company (hereinafter referred to as the petitioner) maintained its principal place

of business at North Chelmsford, Massachusetts. It filed its income tax returns with the former collector of internal revenue for the fourth district of Massachusetts for the years 1948 to 1952, and with the director of internal revenue for the fourth district of Massachusetts for the year 1953.

The Southwell Wool Combing Company (hereinafter referred to as the old company) was incorporated under Massachusetts law in 1922. It owned and operated two wool-combing plants in North Chelmsford, Massachusetts, at which it combed wool into tops and noils for top-makers on a commission basis.

In April 1947, the capitalization of the old company consisted of 35,000 shares of no-par stock, owned as follows:

| *William B. Smith Group* | *Shares* | *Per cent* |
|---|---|---|
| William B. Smith Trust | 25,500 | ____ |
| Lida M. Hood | 1,600 | ____ |
| Mary H. Robertson | 1,000 | ____ |
| Elizabeth Hood | 1,000 | ____ |
| Arthur W. Atherton | 1,000 | ____ |
| Henry G. Hood | 400 | ____ |
| Jacob Reed | 2,000 | ____ |
| | 32,500 | 93 |
| *The Southwell Group* | *Shares* | *Per cent* |
| James Southwell | 2,000 | ____ |
| Philip H. Southwell | 300 | ____ |
| Evelyn S. Fessenden | 200 | ____ |
| | 2,500 | 7 |

The conduct of the individuals comprising the Smith Group with respect to their stock was subject to the control of William B. Smith (hereinafter referred to as Smith), the sole trustee of the William B. Smith Trust.

James Southwell was the father of Philip H. Southwell and Evelyn S. Fessenden. Both James and Philip were actively engaged in the management and operation of the old company during 1947 and earlier years. They were the only compensated officers of that company during its fiscal year ended June 30, 1947, and for several preceding years. Philip H. Southwell will hereinafter be referred to as Southwell.

Nichols and Company, Inc. (hereinafter referred to as Nichols), was a Massachusetts corporation engaged in the business of top-making. It purchased wool from sources all over the world and brought it to Boston where it shipped it to various combing mills for conversion into tops and noils. Nichols itself did not own a combing mill. Since 1926, a portion of Nichols's combing was done by the old company. The availability of combing facilities was extremely important to both Nichols and its stockholders.

Top-makers such as Nichols, as distinguished from integrated mills conducting a number of operations to process wool into cloth, have their wool combed on a commission basis by independent combers. During the 10 years prior to 1947, the portion of tops produced by top-makers, as against that produced by integrated mills, substantially increased. As a result, there developed a shortage of independent combing facilities in the wool trade. For that reason, a number of top-makers, including Nichols, began seeking arrangements whereby they could assure themselves of adequate combing facilities. In early 1947, Smith was approached by several top-makers who were interested in the possible purchase of his interest in the old company.

During 1947, Arthur O. Wellman (hereinafter referred to as Wellman) was president of Nichols; John H. Nichols, Jr., its vice president; and Robert P. Hackett its treasurer. These men, together with their families, were the principal stockholders of that corporation at all times material hereto.

Nichols was a heavy borrower of money, and its officers felt that the banks would look on the company with greater approval if it owned just wool and money and not bricks and mortar. Therefore, it held no physical assets and had no subsidiaries. However, its stockholders from time to time had acquired interests in a number of other corporations which were engaged in various branches of the wool industry.

In late January or early February 1947, Wellman learned that Smith was interested in disposing of his interest in the old company. Fearing the possible loss of that company's combing facilities, should control of the business fall into the hands of a competitor, Wellman met with Southwell to discuss the matter. Also present at that meeting was Robert P. Hackett. Southwell indicated that he was interested in increasing the control his family had in the business. At that time Wellman offered the Southwell Group any assistance it might need in acquiring control of the old company. Southwell refused the offer because at that time he hoped his Group would be able to secure private financing for their purchase of the Smith interest.

At the same time, Wellman entered into negotiations with Smith regarding the possible sale of the old company's land, buildings, and machinery. Smith alluded to a sales price of $4,500,000. No satisfactory agreement was reached by the parties and the matter was dropped. Wellman made Smith a tentative offer to purchase all the stock in the old company, "or a sufficient number of shares of the stock to give us control," at $70 per share. Smith rejected that offer as being too low.

During that same period, Smith advised Southwell of his willingness to sell stock in the old company to Southwell on the basis that the value of that stock was $2,500,000, and offered him the opportunity of purchasing the 32,500 shares held by the Smith Group at $71.43 per share.

Southwell was unable to obtain the private financing necessary to effectuate a stock purchase from Smith and, on April 3, went to Wellman and told him he would have to accept his help. Also present at that meeting were Robert P. Hackett and Nichols's counsel, Edward C. Park. Hackett indicated to Wellman that he would be willing to join in a group to be formed by Wellman to aid Southwell. That group was to be composed of Wellman, Robert P. Hackett, John H. Nichols, Jr., and their families (hereinafter referred to as the Wellman Group), nearly all of whom were stockholders of Nichols. It was planned that the Wellman Group would finance the purchase; that the Southwells were to acquire the old company's stock; that the old company would be liquidated and its assets distributed to its shareholders or their trustees; and that those assets would be conveyed to a new corporation in exchange for bonds secured by a mortgage in the amount of $1,500,000 and common stock, to be divided between the two Groups, 25 per cent to the Southwell Group and 75 per cent to the Wellman Group. It was further planned that Southwell should have an option to purchase additional stock in the new Company, conditioned upon payment of the mortgage, and that cash in the amount of some $500,000, which was held by the old company, be kept by the stockholders and not conveyed to the new corporation. At that time, Park advised that in his opinion the exchange would be taxable but that the new corporation would acquire a stepped-up basis for the assets which it received.

Shortly thereafter, it was decided to employ Nichols & Company as a financing agent since it was easier for Nichols to borrow the necessary 2 million some odd dollars than for the members of the Wellman Group to secure the money.

Between April 10 and April 24, Smith formally offered Southwell the 25,500 shares of stock in the old company which he controlled at $71.43 per share. At that time, he told Southwell that he would not negotiate for a sale of the old company's fixed assets but that he believed he could deliver not only his 25,500 shares but also the remaining shares held by the Smith Group.

A further conference was held between Wellman, Southwell, Park, and Southwell's counsel, John S. McCann, wherein it was agreed, at the instance of Southwell, that he should have explicit assurance that Nichols and the Wellman Group would act according to their plan. Although Southwell had faith in Wellman, he felt, should something happen to him, the others might not see the transaction

through to completion. Accordingly, on April 24, Nichols and Southwell entered into an agreement by which Nichols agreed to purchase from Southwell any shares of the old company's stock which Southwell might tender within 60 days from the date of the agreement at a price of $71.43 per share. Nichols further agreed to resell to Southwell, upon his request, any stock so purchased at any time after 1 year and within 10 years of the agreement. Southwell, in turn, granted Nichols the right of first refusal on any shares he might sell during the 5 years immediately subsequent to the agreement.

On April 25, 1947, Southwell agreed to purchase from Smith 30,500 shares of the old company's stock at $71.43 per share. Smith agreed to use his best efforts to effect a sale of the remaining 2,000 shares held by the Smith Group. Southwell deposited $50,000 with Smith, agreeing to pay the balance of the purchase price on or before May 14, 1947.

On May 9, 1947, there was a closing of the Smith-Southwell purchase agreement. All stock in the old company, other than that owned by the Southwell Group, was purchased by Southwell, his mother, and his sister at $71.43 per share, as follows:

| Name | Number of shares received | Consideration paid |
|------|---------------------------|--------------------|
| Philip Southwell | 30,890 | $2,206,472.70 |
| Fredeline E. E. Southwell | 735 | 52,501.05 |
| Evelyn S. Fessenden | 875 | 62,501.25 |
| | 32,500 | 2,321,475.00 |

To finance that purchase, Southwell, on May 9, borrowed from Nichols $2,158,971.75 on his 60-day promissory note. The balance of the purchase price was made up of the $50,000 deposited by Southwell with Smith, and $112,503.25 furnished by the Southwell Group.

At a meeting held on May 9, 1947, the following were elected officers and directors of the old company:

James Southwell, director, president.
Philip H. Southwell, director, treasurer, clerk.
Henry F. Fessenden, director.
Evelyn S. Fessenden, director.

Henry F. Fessenden was the husband of Evelyn S. Fessenden.

During May and June, counsel for the Southwell and Wellman Groups were engaged in drafting various instruments necessary to effect the liquidation of the old company, the organization of petitioner, and the transfer of the physical assets from the old company to the petitioner. Thereafter, an appraisal of the assets of the old company was made, a minute book and corporate seal ordered for the new company, and so forth.

Originally, it had been contemplated that the Southwell Group would retain all the shares of the old company until liquidation. However, that plan was changed, and on June 25, 1947, Southwell

sold Nichols 21,000 shares of stock of the old company. That sale decreased the Southwell Group's interest in the old company to 40 per cent and gave Nichols a 60 per cent interest. The proceeds of that sale were applied against Southwell's note, reducing the amount owed Nichols to $658,941.75. On June 26 the old company declared a two-for-one stock dividend of 70,000 shares on its outstanding 35,000 shares. On June 30 Southwell sold Nichols 15,750 shares of the old company's stock, thereby reducing the Southwell Group's interest to 25 per cent and increasing that of Nichols to 75 per cent. The proceeds of that sale were likewise applied against Southwell's indebtedness to Nichols, reducing it to $283,934.25. On that same day, Southwell sold 1,500 shares to James Southwell for $35,715; 550 shares to Fredeline E. E. Southwell for $13,095.50; and 800 shares to Evelyn S. Fessenden for $19,048. The parties delivered to Southwell their demand notes for the amounts due from them.

Coats & Burchard Company submitted their appraisal of the physical properties of the old company as of June 30 on the basis of an overall market value as part of a going concern. That valuation included physical assets only and excluded material and supplies, manufactured products, and intangible assets. The certified market value for those physical properties as of that date was $1,809,147.

On June 30, 1947, subsequent to the completion of the aforementioned transactions, the stockholders of the old company voted for a liquidation of the company and distribution of its assets. Accordingly, on that day the old company transferred to its shareholders most of its assets, including its land, machinery, equipment, and cash subject to its outstanding liabilities, in consideration for which they surrendered their shares for cancellation. The old company was not dissolved until later in the year.

Relative to the Southwell fears of a possible tax liability upon liquidation, Nichols addressed the following letter to the members of the Southwell Group under date of June 30, 1947:

Madams and Gentlemen:

This letter is to evidence our agreement with each of you to reimburse you an amount equal to any amount you may be required to pay the United States Government or the Commonwealth of Massachusetts as income tax on any gains realized by you in the liquidation of the Southwell Wool Combing Company.

We shall have the option of making such reimbursement to you by offering to accept and pay for bonds of Southwell Combing Company at a premium of $20 for each $100 of face value to the extent required to make such premiums equal your tax liabilities on account of such gains. If the option is exercised failure to tender the bonds shall terminate our liability hereunder.

Very truly yours,

NICHOLS & COMPANY, INC.
By /s/ Arthur Wellman

As a result of the liquidation, the Southwell Group paid a tax of $24,578.34 to the State of Massachusetts and a tax of $39,536.17 to the Federal Government on the gains realized by them.

As a result of the distributions of cash received upon liquidation, James Southwell, Fredeline E. E. Southwell, and Evelyn S. Fessenden paid their notes to Southwell who applied the amounts so received, along with the amount he realized upon the old company's liquidation, against his indebtedness to Nichols, reducing it to $158,931.75.

On July 1, 1947, the petitioner was incorporated under Massachusetts law. It accepted an offer from the shareholders of the old company to transfer to it all the assets, except $500,010 cash, they had received on liquidation of the old company. Of that amount, Nichols had received $375,007.50. In exchange, petitioner agreed to issue to them its 6 per cent 10-year first mortgage bonds in the amount of $1,680,000, and all 28,000 shares of its authorized common stock having a par value of $322,000. Petitioner further agreed to assume all obligations of the old company. Accordingly, the transfers were made and the stock and bonds issued in the following amounts:

| Name | Stock Number of shares | Bonds Face amount |
|---|---|---|
| James Southwell | 2,000 | $120,000 |
| Fredeline E. E. Southwell | 735 | 44,100 |
| Evelyn S. Fessenden | 1,075 | 64,500 |
| Philip H. Southwell | 3,190 | 191,400 |
| | 7,000 | 420,000 |
| Nichols & Co | 21,000 | 1,260,000 |
| Total | 28,000 | 1,680,000 |

On July 1, 1947, Southwell and Nichols entered into an agreement whereby Nichols agreed to sell Southwell any of petitioner's bonds which Nichols might own at par plus accrued interest. It was further agreed that for every $3,000 of bonds redeemed or paid by petitioner, or so purchased by Southwell, Southwell should have the right to purchase from Nichols 50 shares of petitioner's common stock. However, Southwell's right to purchase such stock was subject to certain limitations. Prior to July 1, 1952, he could not purchase more than 7,000 shares. Thereafter, any purchase of stock was conditioned on the purchase or retirement of all the bonds held by Nichols and the purchase of all the stock then remaining in Nichols' hands. The agreement further provided:

Nichols agrees to retain Bonds of the Company in the face amount of $200,000 subject to the terms of this Agreement, but may dispose of the balance of the Bonds acquired by it as it may see fit. Nichols also agrees that it will not dis-

pose of any of the shares of the Company now held by it without providing that the shares transferred shall remain subject to the terms of this Agreement and to the rights to purchase of Southwell hereunder. A transfer of shares, to voting trustees who assume the Company's obligation to sell to Southwell upon the terms and conditions hereinabove provided, shall be deemed a compliance with the terms of this paragraph. * * *

On July 1, 1947, and thereafter, petitioner maintained its manufacturing operations and principal place of business at the same plants where such had been maintained by the old company. The former operating personnel of the old company were also employed by petitioner. James Southwell, Philip H. Southwell, Evelyn S. Fessenden, and Henry Fessenden became directors of the new company. On July 1 they elected James Southwell president and Philip Southwell treasurer.

On July 9 Southwell's note to Nichols came due. In lieu of further payment, Southwell executed a new note in the amount of $158,931.75, the amount outstanding at that date.

From the outset, it had been understood that control of the new corporation would ultimately repose in the Wellman and the Southwell Groups. It was further understood that the members of the Wellman Group would take their interests in approximately the same proportion as their interests in Nichols. On or about June 23, a conference was held between Wellman, Southwell, and Park with respect to Southwell's option to purchase additional stock in the new company and the effect of that option upon the Wellman Group. That conference resulted from Southwell's inquiry as to what source he would have to look to should he exercise his option to buy additional stock in the new company. It was suggested at that meeting that the shares of the Wellman Group be transferred to a voting trust in order that Southwell would have one source from which he could purchase any such additional shares. On July 10 Park received a memorandum from McCann relative to the division of shares of such a trust, as a result of which he conferred further with Wellman. Finally, on July 15, the voting trust was created. Wellman, Nichols, Jr., and Hackett were appointed voting trustees. Nichols transferred to them the 21,000 shares of petitioner's stock which it then held. The trustees were made expressly liable for the performance of Nichols's July 1 agreement with Southwell relative to the latter's right to purchase those 21,000 shares. The beneficial interest in the trust was divided into 210 voting trust certificates. On July 16 these 210 certificates were issued to Wellman, Nichols, Jr., Hackett, and Hackett's wife, son, and daughter, for a total consideration of $240,030 paid by them. At no time prior to July 15 was there any contract in existence which required Nichols to transfer its interest in petitioner to any of its own stockholders.

On October 7, 1947, at a meeting of the old company's board of directors, its treasurer was authorized to execute an assignment to its shareholders of any remaining assets. Later in that month those shareholders transferred to petitioner all assets received from the old company not previously transferred. On December 24, 1947, the old company was dissolved.

Southwell, on January 2, 1948, paid in full his indebtedness of $158,931.75 on his note to Nichols.

Petitioner retired the bonds issued upon its organization in the amounts and during the periods as indicated below. Also set forth are petitioner's net earnings for the periods wherein retirements were made:

| Taxable year ended June 30 | Face amount of bonds retired | Petitioner's net earnings |
|---|---|---|
| 1948 | $680,000 | $655,844.19 |
| 1949 | 300,000 | 421,196.97 |
| 1950 | 168,000 | 615,060.53 |
| 1951 | 532,000 | 530,569.32 |
| Total | 1,680,000 | 2,222,671.01 |

The fair market value as of July 1, 1947, of the depreciable assets of the old company which were transferred to petitioner was not less than $1,712,275.58. The value of those same assets on the books of the old company on June 30, 1947, after depreciation to that date, was $427,588.28. The petitioner took those depreciable assets on its books at their fair market value as of July 1, 1947, and claimed depreciation for the years in issue on that basis.

All the steps taken by the parties, from the original acquisition of Smith's interest through the creation of the voting trust, were interdependent steps in an overall plan, the objective of which was the acquisition of the combing facilities of the old company for the benefit of Nichols & Company.

OPINION.

The sole issue for decision is whether the assets acquired by petitioner retain for depreciation purposes the basis which they had in the hands of the old company, or whether petitioner is entitled to depreciate them on the basis of their fair market value as of July 1, 1947.

Respondent's position is that petitioner's basis must be determined under the provisions of section 113 (a) (7) inasmuch as the transaction by which it received the assets involved herein constituted a section 112 (b) (3) tax-free exchange of stock of one corporation for stock of another corporation incidental to a reorganization within

the meaning of section 112 (g) (1) (D).[1]   In support of that position, he argues that the decision to reorganize the business was not adopted until Nichols acquired its interest in the old company, and that the reorganization itself was completed prior to the creation of the voting trust and that, therefore, immediately after the transfer, the transferor's stockholders, Nichols and the Southwell Group, were in control of the business within the meaning of section 112 (g) (1) (D).

Petitioner, on the other hand, argues that all the steps taken by the parties from Southwell's original acquisition of Smith's interest through the creation of the voting trust for the members of the Wellman Group, were interdependent steps in an overall plan, the objective of which was the acquisition of the combing facilities of the old company for the benefit of Nichols & Company, and that when viewed as such, it is clear that there was no statutory reorganization since neither the transferor nor its stockholders were in control of the transferee immediately after the transfer.   That is to say, at the outset Smith and the Southwell Group controlled the enterprise, and at the conclusion the Southwell and the Wellman Groups maintained that control.   For reasons hereinafter set forth we agree with the petitioner.

It is well settled that where a transaction is comprised of a series of interdependent steps, that is to say, where the legal relationships created by any one step would have been fruitless without the completion of the entire series, the various steps are to be integrated into one for the purpose of arriving at the tax consequences of the transaction.   *American Wire Fabrics Corporation*, 16 T. C. 607 (1951); *American Bantam Car Co.*, 11 T. C. 397 (1948), affd. 177 F. 2d 513

---

[1] SEC. 113.   ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.
  (a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property; except that—
  *      *      *      *      *      *      *
    (7) TRANSFERS TO CORPORATION.—If the property was acquired—
  *      *      *      *      *      *      *
      (B) in a taxable year beginning after December 31, 1935, by a corporation in connection with a reorganization,
    then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. * * *
SEC. 112.   RECOGNITION OF GAIN OR LOSS.
  (b) EXCHANGES SOLELY IN KIND.—
  *      *      *      *      *      *
    (3) STOCK FOR STOCK ON REORGANIZATION.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.
  *      *      *      *      *
  (g) DEFINITION OF REORGANIZATION.—As used in this section (other than subsection (b) (10) and subsection (l)) and in section 113 (other than subsection (a) (22))—
    (1) THE TERM "REORGANIZATION" MEANS * * * (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred * * *

(C. A. 3, 1949) ; *Illinois Water Service Co.*, 2 T. C. 1200, 1231 (1943) ; Paul, Selected Studies in Federal Taxation, pp. 200–254 (2d series). Where the facts warrant the integration of a series of steps into one, it is the situation at the beginning and at the end of the series which determines whether there has been a statutory reorganization, or merely a taxable exchange. *Republic Steel Corp.* v. *United States*, 94 Ct. Cl. 476, 40 F. Supp. 1017 (1941) ; *Walter S. Heller*, 2 T. C. 371 (1943), affd. 147 F. 2d 376 (C. A. 9, 1945).

We are convinced by this record, and have found as a fact, that all the steps taken by the parties, from the original acquisition of Smith's interest through the creation of the voting trust, were interdependent steps in an overall plan, the objective of which was the acquisition of the combing facilities of the old company for the benefit of Nichols & Company. We are of the opinion that this proceeding falls squarely within the above-mentioned rule and therefore those steps are to be integrated for the purpose of deciding whether the requisite "control" survived the exchange so as to bring it within the provisions of section 112 (g) (1) (D).

When the steps are thus viewed as a whole, we are faced with a transaction which began on May 9, 1947, and ended on or about July 15, 1947. At the beginning, the stock of the old company was owned 93 per cent by the Smith Group and 7 per cent by the Southwell Group, whereas at the end the Wellman Group owned 75 per cent and the Southwell Group 25 per cent of the stock of the petitioner. Clearly, therefore, no continuity of interest survived the exchange, and respondent's determination that a statutory reorganization occurred is without merit.

The reorganization and basis provisions of the statute have a twofold purpose. The reorganization provisions permit the owners of a corporation to effect a change in its capital structure without incurring a tax liability, while the basis provisions prevent the owners of property from stepping up its basis by a change in the *form* of ownership when there has been no change of *ownership* in fact. *Republic Steel Corp.* v. *United States, supra.* Neither purpose has been frustrated in the instant proceeding. Inherent in the concept of "reorganization" as used in the statute is that there must be a real continuity of interest in the owners of the old corporation and the owners of the new. *LeTulle* v. *Scofield*, 308 U. S. 415 (1940) ; *Cortland Specialty Co.* v. *Commissioner*, 60 F. 2d 937 (C. A. 2, 1932). Here, immediately prior to, and as part and parcel of, the series of events which the respondent has carved out of the entire transaction in an attempt to demonstrate a thwarting of the second purpose noted above, there was a complete shift of control of the property from one group, the Smith and Southwell Groups, to a totally unrelated group, the Wellman and the Southwell Groups. It

is that shift of control which establishes that there was no statutory reorganization, but only a purchase and sale entitling the petitioner to use as its basis for the assets so acquired their cost to it. We further note that this is not a case where the taxpayer is attempting to step up the basis of assets already in its possession. Petitioner received the assets in question in exchange for its capital stock and $1,680,000 in bonds, the latter being redeemed within 4 years of their issuance.

The record also supports petitioner's alternative contention that the instant series of steps constituted one transaction, the substance of which was the purchase by petitioner of the assets of the old company, and therefore the basis of the property thus acquired is the cost of the stock. *Commissioner* v. *Ashland Oil & R. Co.*, 99 F. 2d 588 (C. A. 6, 1938), certiorari denied 306 U. S. 661 (1939); *Orr Mills*, 30 T. C. 150 (1958); *Estate of James F. Suter*, 29 T. C. 244 (1957); *Kimbell-Diamond Milling Co.*, 14 T. C. 74 (1950), affd. 187 F. 2d 718 (C. A. 5, 1951), certiorari denied 342 U. S. 827 (1951); *Koppers Coal Co.*, 6 T. C. 1209 (1946); *Georgia Properties Co.* v. *Henslee*, 138 F. Supp. 587 (M. D. Tenn., 1955). However, in the light of the conclusion set forth above, we do not find it necessary to reach this alternative argument.

The parties agreed, in the event we reached this conclusion, upon the proper amounts to be used by petitioner for depreciation purposes.

We believe it appropriate to note here that the additional evidence received upon rehearing presented this proceeding in an entirely different light than when originally before us. Accordingly, we have made revised findings of fact and have reached the conclusion as stated above.

*Decisions will be entered under Rule 50.*