JOHN G. MOFFATT, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1086-62—1092-62. Filed June 16, 1964.

*Joseph D. Peeler*, *Brian J. Kennedy*, and *Richard A. Gadbois, Jr.*, for the petitioners.

*Lawrence S. Kartiganer*, for the respondent.

---

[1] Proceedings of the following petitioners are consolidated herewith: Mary E. Moffatt, docket No. 1087–62; John G. and Mary E. Moffatt, docket No. 1088–62; Frank E. Nichol, docket No. 1089–62; Ruth H. Nichol, docket No. 1090–62; Frank E. and Ruth H. Nichol, docket No. 1091–62; and George G. and Anna Mae Murray, docket No. 1092–62.

568

OPINION

RAUM, *Judge:* Petitioners received certain distributions from Moffatt & Nichol, Inc., in 1958 and 1959 in the course of the liquidation of that corporation. They treated such distributions as being in exchange

for their stock and determined capital gains thereon by subtracting the cost of their stock from the amounts distributed to them.[3] And they offset against such capital gains their unused capital loss carry-covers from 1954–57 as well as their nonbusiness bad debt losses incurred in 1959. If that's all there were to the matter, petitioners' position would be unassailable, and the Government does not contend otherwise. However, the Government's position is that there is more to the picture. It contends that pursuant to a prearranged plan there was a corporate reorganization under sections 368 and 354 [4] whereby a new corporation, Moffatt & Nichol, Engineers, succeeded to the business of Moffatt & Nichol, Inc., in 1957; that it was part of the plan to

---

[3] SEC. 331. GAIN OR LOSS TO SHAREHOLDERS IN CORPORATE LIQUIDATIONS.

(a) GENERAL RULE.—

(1) COMPLETE LIQUIDATIONS.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock.

(2) PARTIAL LIQUIDATIONS.—Amounts distributed in partial liquidation of a corporation (as defined in section 346) shall be treated as in part or full payment in exchange for the stock.

(b) NONAPPLICATION OF SECTION 301.—Section 301 (relating to effects on shareholder of distributions of property) shall not apply to any distribution of property in partial or complete liquidation.

SEC. 346. PARTIAL LIQUIDATION DEFINED.

(a) IN GENERAL.—For purposes of this subchapter, a distribution shall be treated as in partial liquidation of a corporation if—

(1) the distribution is one of a series of distributions in redemption of all of the stock of the corporation pursuant to a plan * * *

[4] SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.

(a) REORGANIZATION.—

(1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

* * * * * * *

(D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356;

* * * * * * *

(c) CONTROL.—For purposes of part I (other than section 304), part II, and this part, the term "control" means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation.

SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS.

(a) GENERAL RULE.—

(1) IN GENERAL.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

* * * * * * *

(b) EXCEPTION.—

(1) IN GENERAL.—Subsection (a) shall not apply to an exchange in pursuance of a plan of reorganization within the meaning of section 368(a)(1)(D), unless—

(A) the corporation to which the assets are transferred acquires substantially all of the assets of the transferor of such assets; and

(B) the stock, securities, and other properties received by such transferor, as well as the other properties of such transferor, are distributed in pursuance of the plan of reorganization.

delay the liquidation of the old company; that the latter had a large amount of accumulated earnings and profits; that the 1958 and 1959 distributions were merely an incident of the corporate reorganization, and to the extent of accumulated earnings and profits the gains constituted dividends under section 356 [5] taxable to petitioners as ordinary income rather than capital gains; and that therefore the capital loss carryovers from prior years and the nonbusiness bad debt losses in one of the current years (1959) could not be used as an offset against such distributions as was done by petitioners. If the transaction did qualify as a corporate reorganization, petitioners do not contest the treatment of the distributions as taxable dividends under section 356(a)(2), with the consequence that the capital loss carryovers and nonbusiness bad debt losses may not be applied against them. They argue, however, that the liquidation of the old company was an entirely separate and independent transaction and that there was not in fact or in law the reorganization for which the Government contends. As we appraise the evidence in this case we think the Government's position is correct.

The word "reorganization" is defined in section 368, and the Government relies particularly upon section 368(a)(1)(D) which begins by describing a "reorganization" to mean "a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders * * * is in control of the [transferee] corporation." There was here a transfer of the business of the old company to Engineers,[6] the same stockholders were in control of the new company, and there can be no doubt that the foregoing requirement of section 368(a)(1)(D) was met. However, there are additional requirements by reason of the fact that section 368(a)(1)(D) makes applicable the provisions of sections

---

[5] SEC. 356. RECEIPT OF ADDITIONAL CONSIDERATION.
  (a) GAIN ON EXCHANGES.—
    (1) RECOGNITION OF GAIN.—If—
      (A) section 354 or 355 would apply to an exchange but for the fact that
      (B) the property received in exchange consists not only of property permitted by section 354 or 355 to be received without the recognition of gain but also of other property or money,
then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.
    (2) TREATMENT AS DIVIDEND.—If an exchange is described in paragraph (1) but has the effect of the distribution of a dividend, then there shall be treated as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be treated as gain from the exchange of property.
[6] We have found as a fact that the most valuable asset of an architectural engineering business, such as that conducted by Moffatt & Nichol, Inc., consists of its staff of trained personnel and the past performance and qualifications of its employees. The entire staff and operating business of Moffatt & Nichol, Inc., were transferred to Engineers, and there was therefore a transfer of at least "part" of the assets so as to meet that portion of the foregoing requirement of sec. 368(a)(1)(D). Whether there was a transfer of "substantially all" of the assets within the meaning of sec. 354(b)(1)(A) is another matter that will be considered hereinafter.

354, 355, and 356, and it is operative only if, in pursuance of the plan, stock or securities of the new company are distributed in a transaction which qualifies under one of these other sections.

The key provisions in controversy herein are found in section 354. There is a vigorous dispute between the parties as to whether the distributions were made in "pursuance of the plan of reorganization" under section 354(b)(1)(B), and whether there was an exchange of stock in the old company for stock in the new company under section 354(a)(1). The answer to these two questions depends upon whether the delayed liquidation of Moffatt & Nichol, Inc., was part of the original plan, that is, whether the various steps occurring over a period of several years were merely interrelated parts of a unified plan contemplating the transfer of the engineering business to a new corporation with the eventual disappearance of the old, so that, viewing the transaction as a whole, the distributions can be regarded as having been made in pursuance of the plan of reorganization and the stock in the new company can be regarded as having been received in exchange for stock in the old. In addition to the foregoing issues, a third question is presented as to whether Engineers acquired "substantially all of the assets" of Moffatt & Nichol, Inc., so as to satisfy the demands of section 354(b)(1)(A).

1. *Whether There Was a Plan of Reorganization and Whether the Delayed Liquidation of Moffatt & Nichol, Inc., Was Part of That Plan.*—Howard's memorandum bearing the date May 6, 1957, recommended, in pursuance of providing the "principal stockholders with the sought-after capital gains," that Moffatt & Nichol, Inc., transfer its engineering business to a new corporation and make distributions which would extend over a period in excess of 1 year. It read in part as follows:

An alternative may be found in the delaying of liquidation with a transfer of operations. Under this plan the existing corporation would remain in existence for a period of time, its only activity being completion of present projects and collection of outstanding accounts. This would be accompanied by the formation of a new organization to take on new contracts. The effect would be to defer the payment of the taxes mentioned before and also to cover the possibility of additional non-business bad debts in the hands of the individuals which may occur in future years. This plan of course would require a division of labor and other costs with the resulting increase of time and cost in record keeping. The period for which liquidation could be delayed would be determined by application of section 531, which would probably be about one year after the plan became effective.

The aforementioned plan was carried out in all important respects,[7]

---

[7] The only notable difference was that the Howard memorandum contemplated that the old company would complete the existing contracts, whereas, under the plan that was adopted, the new company performed the services under the existing contracts as well as under the contracts acquired thereafter. This modification merely dispensed with costly accounting and record keeping but did not in any way affect the substance of the plan involving the delayed liquidation of the old company.

and the fact that it was weighs heavily as tending to indicate that, at the time of the transfer, there was a plan to liquidate the transferor corporation.

On July 22, 1957, approximately 2½ months after Howard had prepared his memorandum, Engineers was incorporated. As of October 1, 1957, all of the personnel and employees of Moffatt & Nichol, Inc., were transferred to Engineers, and the latter corporation thereafter conducted the same consulting engineering business theretofore carried on by the transferor, at the same address and using the identical facilities. The same persons controlled the new corporation, bearing a similar name, and gave assurances to its principal client that there would be continuity of the enterprise without change in officers, personnel, or available resources. The primary activity of Moffatt & Nichol, Inc., subsequent to October 7, 1957, was the collection of accounts receivable. In December 1958, approximately 14 months after the transfer, Moffatt & Nichol, Inc., began to liquidate; the liquidation was completed in January 1960.

Petitioners Moffatt and Nichol had each suffered nonbusiness bad debt losses in 1954, 1956, and 1957 in the amounts of $37,247.40, $3,525, and $6,573.63, respectively. And in 1959 they each suffered further personal bad debt losses in the amount of $24,923.47; these losses were anticipated by them at the time of the conference on April 12, 1957, which Howard attended. Petitioners Moffatt and Nichol utilized these losses by applying them against the "sought after" capital gains realized upon the liquidation of Moffatt & Nichol, Inc.

The action of both the corporation and its "principal stockholders" was hand-in-glove with Howard's plan. One could hardly conceive of a more perfect fit; it was indeed tailormade. It is abundantly clear that what on the surface might appear to be an unrelated transfer of a corporation's business in 1957 and a liquidation of that corporation some 14 months later, was in reality a series of integrated steps pursuant to a preconceived plan. And in such situation, the separate steps will be disregarded. *Walter S. Heller*, 2 T.C. 371, 382–383, affirmed 147 F. 2d 376 (C.A. 9), certiorari denied 325 U.S. 868; *William M. Liddon*, 22 T.C. 1220, 1225, approved as to this point but reversed on other grounds 230 F. 2d 304 (C.A. 6), certiorari denied 352 U.S. 824; *Pebble Springs Distilling Co.*, 23 T.C. 196, affirmed 231 F. 2d 288 (C.A. 7), certiorari denied 352 U.S. 836; *Ethel K. Lesser*, 26 T.C. 306, 311; *Southwell Combing Co.*, 30 T.C. 487; *David T. Grubbs*, 39 T.C. 42, 49. Cf. *D. W. Douglas*, 37 B.T.A. 1122, 1127–1128, where distributions made by the transferor were treated as incident to a reorganization although they were made approximately 5 years after the transfer of assets to the transferee corporation.

Petitioners, in an effort to show that the liquidation of the old company was entirely unrelated to the transfer of the business to the new company, contend that the reason for the transfer was to enable Bobisch to acquire 10 percent of the stock for $2,500, and not, as the Commissioner contends, to secure capital gains. Indeed, this was the sole reason given by them for the transfer. We heard testimony in support of that position, but the short answer is that, in the context of the record before us, we did not find it credible. We think that the Bobisch evidence—and we note that Bobisch himself was not called as a witness—represents merely an ex post facto effort to assign a reason for the transfer that was not in fact the motivating factor in the transaction. Cf. *Weyl-Zuckerman & Co.*, 23 T.C. 841, 847–848, affirmed 232 F. 2d 214 (C.A. 9); *Frank Spingolo Warehouse Co.*, 37 T.C. 1, 5–6; *Clearview Apartment Co.*, 25 T.C. 246, 253–254. And although there were various negotiations with Bobisch, we reject as unworthy of belief the testimony to the extent that it disavowed the existence of a preconceived plan to transfer the engineering business to a new corporation and then obtain the "sought after" capital gains at a later time through liquidation of the old company. Petitioners also make much of Moffatt's testimony that he never saw the Howard memorandum; but whether or not he did is a matter of little consequence. The point in this connection is that we are fully satisfied that the substance of that memorandum was communicated to those who controlled or guided the affairs of the corporation and that they acted upon the advice contained therein. We refuse to believe that it was all a grand coincidence.

Nor are we driven to a contrary conclusion by the fact that during the interim period, prior to liquidation, consideration was given to entering into several new projects in behalf of the old corporation. Merely because those who dominated Moffatt & Nichol, Inc., saw a few seemingly attractive business opportunities and therefore possibly considered deviating from the plan of liquidating the corporation is no compelling reason to conclude that no such plan existed. Moreover, the acquisition of additional business interests is not inconsistent with a plan to liquidate, for such subsequently acquired assets could be distributed to the shareholders in carrying out the plan of liquidation. Cf. *Malcolm C. Howell*, 40 T.C. 940, 946.

We have taken various other items of evidence into account urged upon us by petitioners as negativing the existence of a preexisting plan to liquidate but we do not find them persuasive. We are convinced on the record before us that such plan did exist, and that the transfer of the engineering business to the new company and the delayed liquidation of the old company were carried out in accordance with that plan.

*Charles R. Mathis, Jr.*, 19 T.C. 1123, acq. 1953–2 C.B. 5, is not help-

ful to petitioners. In *Mathis* the old corporation was liquidated and 9 months later a new corporation was organized to which assets formerly owned by the old corporation and other assets were transferred. The Court found (p. 1130) that, upon "[considering] all the facts in the record," the liquidation of the old corporation and the incorporation of the new company "were separate and independent transactions, and not part of the one overall plan conceived prior to the de facto distribution of all the Corporation's assets." Here there was no such gap between the time of liquidation and the time of incorporation since the engineering business was operated uninterruptedly under a corporate roof at all times; and in any event we cannot make the same finding here that was made in that case.

2. *Whether There Was an Exchange of Stock for Stock Within Section 354(a)(1).*—Admittedly, the stockholders of the old company did not in form exchange their stock for stock in the new company. But the considerations discussed in 1, *supra*, establish that there was a unified plan of reorganization involving the delayed liquidation of the old company; accordingly, the transaction, which extended over a period of several years, must be viewed as a whole, disregarding the intermediate steps. "A given result at the end of a straight path is not made a different result because reached by following a devious path." *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609, 613.[8]

Viewing the transaction as a whole, it is clear that when it was completed the shareholders had surrendered their stock in the old company and were stockholders in the new company carrying on the same business. Disregarding the intermediate steps there was in substance merely an exchange of stock for stock in a corporate reorganization, accompanied by the distribution of "boot" or a taxable dividend under section 356(a), footnote 5, *supra*. "The net result was that petitioner and the other two stockholders had substituted their interest in the * * * [old] corporation for substantially the same interest in the * * * [new] corporation." *Walter S. Heller*, 2 T.C. 371, 383, affirmed 147 F. 2d 376 (C.A. 9), certiorari denied 325 U.S. 868. "In form this was not an exchange of stock for stock plus something 'to boot'. However, all of the transactions, when viewed as one plan of reorganization, culminated in an exchange of stock for stock plus money [or other property]." *William M. Liddon*, 22 T.C. 1220, 1226, approved as to this point but reversed on other grounds 230 F. 2d 304 (C.A. 6), certiorari denied 352 U.S. 824. "The petitioner also contends that there was not an exchange of stock for stock since the old corporation redeemed its stock and the stockholders paid cash for their stock in the new corporation. * * * Assuming that, as the petitioner says, the stockholders paid cash for the stock, that fact

---

[8] Cf. *North American Loan & Thrift Co. No. 2*, 39 T.C. 318, 330, affirmed 319 F. 2d 132 (C.A. 4), and cases cited.

does not take the transaction out of the statute. * * * The *effect* of these transactions was that the business was transferred to the new corporation and in pursuance of a plan of reorganization the stockholders received stock in a corporation * * * a party to a reorganization, and cash, in exchange for stock in another corporation a party to a reorganization. This is within the terms of sections 354 and 356." (Italics supplied.) *David T. Grubbs*, 39 T.C. 42, 51–52. Cf. also *Commissioner* v. *Morgan*, 288 F. 2d 676, 679–680 (C.A. 3), reversing 33 T.C. 30, certiorari denied 368 U.S. 836, rehearing denied 369 U.S. 826.

We hold that there was an exchange of stock for stock within the meaning of the pertinent statutory provisions.

3. *Whether There Was a Transfer of "substantially all" of the Assets.*—We note preliminarily that "[the] term 'substantially all' is a relative term, dependent on the facts of any given situation." *Daily Telegram Co.*, 34 T.C. 101, 105. Cf. *R. & J. Furniture Co.*, 20 T.C. 857, 864, reversed on another issue 221 F. 2d 795 (C.A. 6). "Whether the properties transferred constitute 'substantially all' is a matter to be determined from the facts and circumstances in each case rather than by the application of any particular percentage." *Milton Smith*, 34 B.T.A. 702, 705. Moreover, in considering the "facts and circumstances" in any given case it is a matter of importance to take into account the liabilities of the enterprise, so that the retention of what might be a large amount of assets in other situations would be of very little consequence if such assets were held back by the transferor in order to pay off its liabilities. *Faigle Tool & Die Corporation*, 7 T.C. 236, 243; Rev. Rul. 57–518, 1957–2 C.B. 253. And finally, it must be remembered that the "substantially all" requirement "has been subjected to [a] construction which in effect applies a continuity test rather than mere blind percentages." *Southland Ice Co.*, 5 T.C. 842, 850, fn. 4.

That the necessary continuity was present here is amply demonstrated by the record. The entire consulting engineering business was transferred to the new company, bearing a similar name and controlled by the same persons. It employed the same personnel, used the same facilities, had the same address, and dealt with the same clients as though nothing had occurred apart from the minor change in name of the business. There was here the most complete continuity of enterprise—the very kind of continuity that is basic to a corporate reorganization with its concomitant nonrecognition of gain or loss except for the distribution of "boot."

Bearing in mind the foregoing considerations and also the necessity of considering the transaction in its entirety—from its inception in 1957 through its completion in early 1960—we are satisfied on the record before us that there was a transfer of "substantially all" the assets of the old company to the new.

Petitioners' position revolves largely around percentages of balance sheet assets of the old company distributed by it in December 1958, 1959, and January 1960. Their contention is fatally defective because (a) they fail to take into account the most important asset of the business that did not appear on the balance sheet at all; and (b) they fail to consider the various steps as part of an integrated preconceived plan and therefore do not take into account certain balance sheet assets as actually having been transferred to the new company.

(a) The most valuable asset of the enterprise did not appear on the balance sheet in any way. It is of the utmost importance to remember that the consulting engineering business is basically a service business. It does not manufacture or sell products. Its income is derived from and its activities consist largely of the preparation of studies, reports, plans, specifications, designs, and related matters. Apart from several clerical employees, its total force of employees consists exclusively of licensed engineers, subprofessional personnel, and draftsmen. As we have found, the most valuable asset of such business is its staff of trained personnel and the past performance and qualifications of its employees. To that we may add the contacts and reputations of the two principals, petitioners Moffatt and Nichol, who were responsible for obtaining virtually all of the contracts for the enterprise through personal solicitation. And it was that package of trained employees, including the active participation of petitioners Moffatt and Nichol, that was transferred at the outset from the old company to the new. This was an asset of enormous importance in the context of this case, cf. *Frederick R. Harris, Inc.*, 40 T.C. 744, 750; yet, it nowhere appears on the balance sheet, and was not taken into account in any way by petitioners in evaluating what was transferred from Moffatt & Nichol, Inc., to Moffatt & Nichol, Engineers.

(b) The balance sheet assets were distinctly of lesser importance to the business. Yet all of those assets that were of any consequence in the conduct of the business found their way into the hands of the new company. To be sure, there was no direct transfer of such assets by the old company to the new, but we have found that the entire transaction was carried out in conformity with a prearranged plan and the intermediate steps may therefore properly be disregarded. In one form or another the new company had the use and benefit of all the assets relating to the operation of the business, whether by "loans," "rentals" of equipment followed ultimately by sale thereof, or otherwise. And it finally wound up with all the assets that were necessary or appropriate to the conduct of the business. There remained in the hands of the stockholders only certain nonoperating assets that were not required in the business, and even these assets were "pledged" by Moffatt & Nichol, Inc., to the new corporation. In the context of this case, where the most important as-

set, considered in (a) above, was not even taken into account by petitioners, and where all other assets of significance eventually found their way into the hands of the new company, we think there was a transfer of "substantially all" the assets within the meaning of section 354(b)(1)(A), and that in any event petitioners have not carried their burden of showing that there was not a transfer of substantially all the assets.

The record does not contain a balance sheet of Moffatt & Nichol, Inc., for October 1 or 7, 1957, when the new company took over its business. However, there is a balance sheet as of December 31, 1957, which is set forth in our findings. It discloses a large amount of liabilities, which must be offset against assets in arriving at any realistic appraisal of what constitutes "substantially all." Cf. *Faigle Tool & Die Corporation, supra* at 243. Moreover, to the extent of other assets on this balance sheet which appear to have been eliminated by the time Moffatt & Nichol, Inc., began formally to liquidate in December 1958, there is no showing that such assets were not used up or otherwise consumed in the conduct of the consulting engineering business—e.g., "inventories," "prepaid expenses and supplies." To the extent that the new company needed working capital it was supplied by the old company in one form or another.

The record shows that when Moffatt & Nichol, Inc., began to liquidate formally in December 1958 through early January 1960, it had balance sheet assets in the aggregate amount of $230,001.16 to distribute.

The first distribution, in December 1958, consisted of two notes from the new company aggregating $40,000, which were turned over to petitioners Moffatt & Nichol. But these notes represents funds previously made available by Moffatt & Nichol, Inc., to the new company, and merely furnish the basis for subsequent tax-free receipts of the principal amounts thereof by petitioners Moffatt and Nichol when they are paid off. In every real sense the funds giving rise to these notes had been transferred by the old company to the new and cannot be excluded from the composition of those items making up "substantially all" of the assets.

The second formal distribution was made on December 22, 1959, consisting of $60,000 in cash paid to petitioners Moffatt, Nichol, and Murray. But there is more to the story in respect of this item. On December 23, 1959, petitioners Moffatt, Nichol, and Murray made "loans" to Engineers in the aggregate amount of $55,900. We refuse to believe that these two events were unconnected. In substance this again was simply a way of transferring funds from the old company to the new and setting the stage for the tax-free recovery of those funds in a later year by the petitioners when their notes would be paid off. Accordingly, we must regard the bulk of this $60,000 distribu-

tion as includable in the items consisting of "substantially all" of the assets.

The third and fourth distributions were made on December 31, 1959. The third distribution consisted of autos, office furniture, and equipment having an aggregate fair market value of $10,169.93, all of which (except an auto which was sold at its depreciated cost of $397.60 to an employee) was "sold" on the next business day, January 2, 1960, to the new company for $9,772.33. The old company owned no other tangible personal property; thus, all of its tangible personal property (except the one auto noted above) found its way ultimately into the hands of the new company.

The fourth distribution, also on December 31, 1959, consisted of accounts receivable, earned but unbilled accounts receivable, and land and building plans, having fair market values in the amounts of $1,979.33, $18,323.92, and $84,995.85, respectively. On January 2, 1960, the next business day, the new company purchased the foregoing accounts receivable to the extent of $18,799.17 (net), leaving $1,504.08 in the hands of the stockholders. Also left in the hands of the stockholders and not transferred to the new company was the land with its accompanying building plans.

The fifth and final distribution was made in January 1960; it consisted of $24,083.64 cash, which the stockholders then promptly transferred or advanced to the new company.

Thus, it is apparent that apart from a few very minor items the only asset of magnitude that did not wind up in the hands of the new company was the vacant real estate and the building plans relating thereto. While it is true that there had at one time been an intention to use that property to construct a building in which to carry on the consulting engineering business, that project had been abandoned and the property no longer had any connection with the conduct of the consulting engineering business. It was a nonoperating asset, and was of no use whatever to the business.[9]

Taking into account the transfer of the package of trained employees (including the principal officers) that is so important in the conduct of this kind of business and that was not even valued by petitioners, and taking into account all the other assets necessary or appropriate to the conduct of the business that ultimately found their way into the hands of the new company, we conclude that the retention of a few minor items plus the land that was no longer of any importance to the enterprise did not prevent this transaction from satisfying the "substantially all" requirement. Cf. *Western Industries Co.* v. *Helvering*, 82 F. 2d 461, 464 (C.A.D.C.), reversing 30 B.T.A.

---

[9] To the extent that the shareholders wound up, in addition, with notes of Engineers, these notes represented transfers of assets made either directly by the old company to the new, or indirectly, using the shareholders as conduits. Cf. *Richard H. Surraunt*, 5 T.C. 665, 672, affirmed as to this issue 162 F. 2d 753 (C.A. 5).

809; *Schuh Trading Co.* v. *Commissioner*, 95 F. 2d 404, 408 (C.A. 7), reversing 34 B.T.A. 1313 (Memo) ; *Commissioner* v. *First National Bank of Altoona*, 104 F. 2d 865, 870 (C.A. 3),[10] petition for certiorari dismissed 309 U.S. 691; *Benjamin R. Britt*, 40 B.T.A. 790, 795, affirmed 114 F. 2d 10 (C.A. 4).

Petitioners' reliance upon *Joseph C. Gallagher*, 39 T.C. 144, is misplaced. There, the owners of 38.05 percent of the stock of the old company did not acquire any interest whatever in the new; and the owners of the remaining 61.95 percent acquired 72⅔ percent of the stock in the new corporation. There was thus absent the necessary continuity of "control" required by section 368(a)(1)(D), since "control" is defined in section 368(c) to mean ownership of at least 80 percent of the stock. See footnote 4, *supra* at 572. Accordingly, there could be no "reorganization" in that case under section 368(a)(1)(D), which is involved herein. This was specifically recognized by the Court in *Joseph C. Gallagher*, *supra* at 161. In the present case, petitioners Moffatt, Nichol, and Murray, who owned 100 percent of the stock in the old company, acquired and at no time owned less than 90 percent of the stock of the new company, thus fully satisfying the requirements of section 368(a)(1)(D), which had not been met in *Gallagher*.

*Decisions will be entered under Rule 50.*

---

[10] In *Commissioner* v. *First National Bank of Altoona,* the court said (p. 870) :

"As stated above, assets which the old company transferred to the new company constituted 86% of its total worth and included all of the assets essential to the operation of its business of distributing gasoline. The 'other assets' retained by the old company, while substantial in amount, were merely investments held by it. If the old company had distributed these 'other assets' to its stockholders prior to these transactions rather than afterward, it could not have been denied that the old company had transferred 'substantially all' of its property to the new company. Instead of doing this, it transferred its distributing business to the new company first and then distributed its 'other assets' to its stockholders as a liquidating dividend. As the 'other assets' were never used to continue the old company in business, and as its liquidation was merely carrying out a previous agreement, it does not seem that the date of the distribution of these 'other assets' should be considered as decisive of the issue. Under the peculiar circumstances of this case, it seems clear that 'substantially all the properties' of the old company were transferred to the new company in exchange for stock in the latter. * * *"