**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**NATIONAL BELLAS HESS, Inc., Respondent.**

No. 15034.

United States Court of Appeals, Eighth Circuit.

March 21, 1955.

**416**

Harry Marselli, Special Asst. to the Atty. Gen. (H. Brian Holland, Asst. Atty. Gen., and Ellis N. Slack, Special Asst. to the Atty. Gen., with him on the brief), for petitioner.

Philip Zimet, New York City (Herman A. Benjamin, New York City, Lyle M. Allen and Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., with him on the brief), for respondent.

Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

The question is whether the Tax Court was warranted in holding, as it did, 20 T.C. 636, that a transfer made of some physical assets and the good will of National Bellas Hess Co., Inc., a New York corporation, to National Bellas Hess, Inc.; a Delaware corporation, for 300,-000 shares of the latter's capital stock,[1] amounted in the situation involved to an exchange of property "in pursuance of the plan of reorganization," within the meaning of § 112(b) (4) of the Internal Revenue Act of 1932, 47 Stat. 169, 26 U.S.C.A. Int.Rev.Acts, pp. 475 et seq., 511.

The New York corporation had previously ceased its business operations and gone into receivership, because of accumulating losses and financing difficulties, and the Delaware corporation (the taxpayer here) had been organized by a group of employees of the old corporation to acquire and attempt to carry on the mail order business in which it had been engaged.

The transfer referred to had been made by the Receivers of the old corporation, under court authority, in 1932. What is involved in this proceeding are some claimed deficiencies in the excess profits taxes of the successor corporation for its fiscal years ending July 31, 1944, and July 31, 1945, resting on a determination of the Commissioner of Internal Revenue, made in 1951, that the 1932 property-transfer-and-stock-issuance transaction had on its elements and circumstances not constituted a nontaxable exchange under the statute but represented instead a mere sale-and-purchase transaction between the parties. The Commissioner had accordingly refused to permit the taxpayer to use, for equity-invested-capital purposes, under 26 U.S.C.A. Int.Rev.Code, § 718(a) (2), in relation to its excess profits taxes

---

1. As part of the transaction, the successor corporation had also assumed an obligation of $180,000 owed by its predecessor in credits to customers, and had further given the predecessor a five-year promissory note for $100,000 secured by a chattel mortgage upon the transferred property. These incidents have been treated by the parties, both in the Tax Court and here, as being without significance or effect upon the question involved, and they will accordingly not be referred to further. As to the reason for this treatment of the $180,000 obligation by the parties, see Internal Revenue Act of 1939, § 213(f), 26 U.S.C.A. Int.Rev.Acts, p. 1177, and Wilgard Realty Co. v. Commissioner of Internal Revenue, 2 Cir., 127 F.2d 514.

for the years referred to, the value basis which the transferred assets had had in the old corporation's hands, and had insisted that it was required to use as its basis the cost to it of the transferred assets as measured by the market value of the capital stock which it had turned over to its predecessor.

The Tax Court, as indicated at the start of this opinion, held that the Commissioner was wrong in his position; that the 1932 transaction duly constituted a non-taxable exchange under § 112(b) (4) [2] pursuant to a reorganization as defined in § 112(i) (1) (B) [3] of the Revenue Act of 1932; and that there thus existed no deficiencies in the taxpayer's excess profits taxes.

We think the decision of the Tax Court is entitled to be affirmed. On this view, it is necessary here only to discuss whether, on the basis of all of the facts related to the 1932 transaction, the transferor properly could be regarded by the Tax Court as having been, within the language of § 112(i) (1) (B) and (j), set out in footnote 3 below, "immediately after the transfer * * * in control [ownership of at least 80% of the voting stock and of all other classes of stock] of the corporation to which the assets are transferred".

The Commissioner contends generally that such control of the new corporation as became lodged in the Receivers of the transferor in 1932 was, and had been intended to be, one of such a transitory nature as to lack legal substance or factual reality in relation to the corporation. More specifically, his contention is that the issuing of stock by the new corporation to the Receivers was merely part of a general plan of interdependent steps for leaving the Receivers without control, upon the occurrence or assumed accomplishing of which the transaction between the two corporations should be regarded as having hinged. These contentions are grounded upon the provisions of the offer which the organizers of the new corporation had submitted for the old corporation's assets, and which the court approved, and also upon the history of what did in fact happen as to the stock situation of the new corporation after the transfer of assets was made.

The offer submitted for the old corporation's assets provided that the new corporation which was to be organized would have an authorized capital of 1,800,000 shares either of $1.00, or of no, par value; that a "Management Group" of former executives and employees of the old corporation would be set up, each of whom would enter into a contract with the new corporation to continue his connection with it for a period of five years, and none of whom should during that period receive a salary of more than $10,000 a year, "except with the approval of the Receivers;" that the corporation should have the right if it chose to do so, to allow its officers and employees to share in any profits made, not exceeding 25 per cent of the amount thereof in any year, and on the condition that any such shared profits would not be paid in cash

**2.** § 112(b) (4): "No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization." 26 U.S.C.A. Int.Rev.Acts, p. 511.

Under § 112(i) (2), "The term 'a party to a reorganization' includes * * * both corporations in the case of an acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation." 26 U.S.C.A. Int.Rev.Acts, p. 514.

**3.** § 112(i) (1) (B): "The term 'reorganization' means [among other things] * * * a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred." 26 U.S.C.A. Int.Rev.Acts, p. 513.

Under § 112(j), "As used in this section the term 'control' means the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation." 26 U.S.C.A. Int.Rev.Acts, § 514.

but would be applied to the purchase of stock in the corporation on behalf of such officers and employees at the price of $1.00 per share, "until the aggregate of stock thus purchased by said employees and officers will be Five hundred thousand (500,000) shares;" that the Receivers were to set up a voting trust for the stock received by them for the transferred assets and were not to distribute or otherwise dispose of the stock, or of any voting trust certificates which they might cause to be issued to themselves, for a period of one year; and that during that one-year period the organizers of the new corporation should have the option to purchase from the Receivers the 300,000 shares of stock, on an "all or none" basis, at a price of $2.00 per share.

As to the history of the corporation's stock situation, the 300,000 shares were duly issued to the Receivers on or before July 30, 1932, pursuant to the court's order of approval of July 13, 1932. These shares constituted, as the Tax Court found, the corporation's "entire original issue of capital stock." Within a few days thereafter, the organizers made purchase of 32,710 shares of stock from the new corporation. Following this, the corporation offered to sell stock to the general public, and in a period of about three months 345,695 shares were so disposed of. By July 31, 1933—a year after the organization of the corporation—all of its stock had been sold and was outstanding, except the 500,000 shares which it intended to permit officers and employees to acquire on a profit-sharing payment basis, whenever profits reached the point where the plan could be made operative. This point was not reached, and none of the stock was so used or issued, until July, 1942, and in succeeding years.

The option which the organizers had taken to purchase the Receivers' 300,000 shares was never exercised by them. Apparently the stock did not acquire a market value, during the option period, of the $2.00 per share which they were required to pay for it. Before the option expired, they made an assignment of it to some bankers, who then entered into negotiations with the Receivers and obtained for themselves a new option, approved by the court, which provided for the right to purchase the stock in separate blocks of 100,000 shares, on three different dates, over a period extending to April, 1935, at prices of $1.50 per share, $1.75 per share, and $2.75 per share, for the respective blocks. These option rights were all duly exercised as they matured, so that by April, 1935, the Receivers had ceased to be a stockholder of the corporation.

■ The Tax Court in its opinion duly recognized the rule, to which it has accorded effect in other of its decisions, that where a transferor of corporate property for another corporation's stock relinquishes the control inherent in its stock ownership, as a step in the plan of reorganization devised, which step is intended to be operatively inseparable from the others involved in the general situation, as being essential to the achieving of the purpose or structure of the plan itself, then the control requirement of the statute is not met; but the court held that the conditions which called for the application of this general rule did not exist in the present situation.

■ Stated in different language, the test generally recognized and applied for determining whether a series of steps in connection with exchanges or reorganizations is to be treated as a single transaction for tax purposes or as a matter of separate entities is that of the mutual interdependence of the steps. 3 Mertens Law of Federal Income Taxation § 20.-114, Cum.Supp. Or, as put by the Tax Court, in American Bantam Car Co., 11 T.C. 397, 405, and repeated in ACF-Brill Motors Co. v. Commissioner of Internal Revenue, 3 Cir., 189 F.2d 704, 707, "Were the steps to interdependent that the legal relations created by one transaction would have been fruitless without the completion of the series?"

The American Bantam Car Co. case, supra, affirmed Per Curiam, 3 Cir., 177

F.2d 513, is illustrative of the realistic rather than theoretical manner in which the Tax Court has applied the test. There, properties were transferred by one corporation to another for 300,000 shares of the latter's common stock, which, just as here, constituted the new corporation's entire original issue of stock. Five days later, the new corporation entered into an agreement with an underwriting group for the marketing of some of its preferred stock to the public, and in connection therewith the old corporation gave the underwriting group the right to purchase one third of its common stock on a proportional basis to the amount of preferred stock disposed of. As a result of the market sales made, the old corporation, at the end of approximately a year, had ceased to have the 80 per cent control prescribed by the statute. The Commissioner contended that this marketing of stock, with the resulting loss of control, from its actual scope, had constituted a material contemplated step in the reorganization scheme and so was entitled to be treated as an integral part of the property-transfer transaction.

The Tax Court rejected this contention and said: "It is true that all the steps may have been contemplated under the * * * general plan; yet the contemplated arrangement for the sale of * * * stock to the public was entirely secondary and supplemental to the principal goal of the plan—to organize the new corporation and exchange its stock for (the old corporation's) assets. The understanding with the underwriters for disposing of the preferred stock, however important, was not a *sine qua non* in the general plan without which no other steps would have been taken. While the incorporation and exchange of assets would have been purposeless one without the other, yet both would have been carried out even though the contemplated method of marketing the preferred stock might fail." 11 T.C. at pages 406–407. See also Scientific Instrument Co., 17 T.C. 1253, affirmed Per Curiam, 6 Cir., 202 F.2d 155.

Here, equally, we think that the Tax Court could properly appraise the sale of stock made to the public, after the transfer transaction was completed, as not having had any intended controlling relationship on whether the exchange of property and stock between the Receivers and the new corporation would have been carried out. There was nothing in the offer made by the organizers to indicate either expressly or impliedly that the parties were dealing upon the intended basis that this was required to be done and would be able to be accomplished.

It may be assumed that it was perhaps understood that the organizers were going to attempt to sell stock to the public, but whether and to what extent and over what period of time this could be done was necessarily, under the economic conditions obtaining in 1932, a bit of a gamble. That gamble the organizers of the new corporation obviously were hopefully willing to make, but in practical evaluation the Tax Court could hardly be required to hold that it was so interdependently linked in the minds of the parties as of controlling relationship in the exchange of assets and stock made and on the matter of control that would be involved in the situation that the transaction between the Receivers and the organizers had hinged thereon.

Similarly as to the proposal which had been contained in the offer made by the organizers for the old corporation's assets, that 500,000 shares of stock were intended to be used in allowing officers and employees to acquire stock in the corporation under a profit-sharing plan, we can see no more basis for holding that the Tax Court was required to regard this as having constituted an interdependent element or step in the reorganization plan, in the sense that it was in effect a condition of the dealing between the Receivers and the organizers and so was legally affective of the control that was involved therein.

The fact that it was not such an interdependent step in the transfer deal is sufficiently demonstrated by the fact

alone that the mention made of it in the organizers' offer for the assets left it wholly optional on the part of the new corporation to put it into effect. Beyond this, the plan never became operative to put any such stock into the officers' and employees' hands until 1942 and succeeding years, by which time the Receivers had ceased to be a stockholder of the corporation.

Nor, in our opinion was the Tax Court any more required to regard the option right, granted by the Receivers to the organizers of the new corporation to purchase the Receivers' stock, as an interdependent step in the reorganization plan, affective of control, because without it the exchange of property and stock would not have been made. The fact that the organizers of the new corporation never even saw fit to exercise it would of itself be sufficient to permit the Tax Court to appraise it as having been a mere bargaining incident and not a constituent, interdependent element in the reorganization undertaking.

■ Something that has never been carried out is without much basis for being argued to have been an interdependent factor on the question of control in a reorganization situation. As said in the ACF-Brill Motor Co. case, supra, 189 F.2d at page 707, "at the very least it must appear that the entire series of transactions [claimed to have constituted interdependent steps in a reorganization] has been carried out in accordance with a prearranged plan * * *." Whatever has not been carried out, in the sense of having been abandoned, necessarily has been of no effect on the matter of existing control in the reorganization accomplished.

On the question of the voting trust involved, we need do no more than quote what the Tax Court said in its opinion, 20 T.C. at page 646: "The respondent [Commissioner] does not question the rule that control relates to equitable ownership and is not negated by the fact that under the court order the predecessor was required to deposit the stock in a voting trust. Federal Grain Cor-

poration, 18 B.T.A. 242; cf. Griswold Co., 33 B.T.A. 537; Peabody Hotel Co., 7 T.C. 600; G.C.M. 2177, VI-2 C.B. 112." The mere fact that stock is deposited in a voting trust does not of itself operate to nullify the control contemplated by the statute. And here the parties themselves both treated the voting trust arrangement as having in no way affected the Receivers' ownership of the stock, both in the original option and in relation to the sale subsequently made.

■ There was in the present situation no such obligational qualification of the control of the Receivers as would be required to be appraised as constituting an interdependent step of affecting relationship in the reorganization scheme planned and carried out, such as existed in May Broadcasting Co. v. United States, 8 Cir., 200 F.2d 852.

Affirmed.