HYMAN H. BERGHASH AND ROSE BERGHASH, PETITIONERS, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

DELAVAN-BAILEY DRUG CO., INC., PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 93308, 93309.   Filed March 11, 1965.

*Robert R. Barrett*, for the petitioners.
*William F. Chapman*, for the respondent.

WITHEY, *Judge:* The respondent determined deficiencies in petitioners' income tax for the years and in the amounts as follows:

| Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|
| Hyman H. and Rose Berghash | 93308 | 1957 | $59,242.42 |
| Delavan-Bailey Drug Co., Inc. | 93309 | Jan. 1 to Feb. 28, 1957 | 11,554.56 |

The issues presented for our decision relate to the correctness of the respondent's action in determining (1) that petitioner Hyman H. Berghash received ordinary income in the form of a dividend in the amount of $122,050.11 and long-term capital gain in the amount of $21,153.24 as distributions from the Delavan-Bailey Drug Co., Inc., during 1957; and (2) that, in the alternative, petitioner Delavan-Bailey Drug Co., Inc., received recognized long-term capital gain resulting from the disposition of certain assets during the taxable period January 1, 1957, through February 28, 1957.

### FINDINGS OF FACT

A portion of the facts have been stipulated and are so found.

Petitioners Hyman H. and Rose Berghash are husband and wife residing in Buffalo, N.Y. They filed their joint income tax return for 1957 with the district director of internal revenue at Buffalo.

Petitioner Delavan-Bailey Drug Co., Inc. (sometimes hereinafter referred to as the old corporation or the predecessor corporation), is a dissolved corporation that originally was incorporated under the laws of the State of New York on July 31, 1933. From the time of its incorporation until January 29, 1957, Delavan-Bailey Drug Co., Inc., owned and operated a retail drugstore located in Buffalo, N.Y.

Throughout its corporate existence the outstanding stock of Delavan-Bailey consisted of 200 shares of common stock which were held as follows:

| Name | Number of shares |
|---|---|
| Hyman H. Berghash | 198 |
| Rose Berghash | 2 |
| Total | 200 |

In 1952 Sidney Lettman (sometimes hereinafter referred to as Lettman), a pharmacist, proposed to Hyman Berghash that they establish a new drugstore in a prospective shopping center in Buffalo, with 50 percent of the stock to be owned by each of them.

Lettman and Berghash at no time have been related in any way.

After further conversations, Berghash and Lettman entered into a contract dated October 20, 1952, for the establishment of a retail drugstore in the proposed shopping center to be known as Seneca Shopping Plaza in Buffalo.

The contract dated October 20, 1952, provided that a corporation should be formed to engage in the retail drugstore business and that each of the parties would invest $2,500 in the new corporation and each would own 50 percent of the stock thereof. The contract also provided that the parties were entering into a lease for a store in the Seneca Shopping Plaza and would assign the lease to the corporation to be formed. It was further agreed that Lettman would be employed as manager of the store at a stated salary, that Berghash would be employed as the president of the corporation and would be in charge of its books at a stated salary. The parties each agreed to deposit $10,000 immediately in a bank account to be turned over to the corporation to be used partly for equity capital and partly for loans to be made to it by Lettman and Berghash or, in the case of default by one of the parties, the deposit was to be retained by the other party as liquidated damages.

Pursuant to the contract dated October 20, 1952, Berghash and Lettman caused the incorporation on November 24, 1952, of a New York corporation known as Dorn's Drugs, Inc. (sometimes hereinafter referred to as Dorn's or the survivor or successor corporation).

Under date of December 5, 1952, Dorn's entered into a lease with Seneca Shopping Plaza, Inc., for the rental of a store in the proposed Seneca Shopping Plaza.

The promoters of the proposed Seneca Shopping Plaza encountered various difficulties in its attempted establishment and finally abandoned the entire project in 1955.

Because the Seneca Shopping Plaza project never became effective, no capital was ever paid into Dorn's and no capital stock was issued by it until the transactions hereinafter described in 1957. Dorn's remained in existence as an inactive corporation from its incorporation to January 29, 1957.

Lettman was employed as a pharmacist by Delavan-Bailey on August 3, 1953. Early in 1954 Lettman became the manager of the Delavan-Bailey drugstore and was continuously employed as its manager until the discontinuance of business by that corporation in 1957.

After the abandonment of the Seneca Shopping Plaza project in 1955, Berghash and Lettman attempted to find another drugstore in which they would be equal owners. They examined several possibilities including locations for new stores as well as established stores to purchase but they were unsuccessful. In the latter part of 1956 Lettman decided that he should look for a drugstore on a smaller scale for himself and he examined one possible location. Prior to this time Lettman had asked Berghash if he could purchase an interest in the business of Delavan-Bailey, but Berghash had refused.

In December 1956, Lettman told Berghash that he had made up his mind to strike out on his own, described the property he had been looking at, and told Berghash that unless he would sell him 50 percent of Delavan-Bailey, he would leave its employ as manager.

Subsequently Berghash told Lettman that he was willing to sell him a 50-percent interest in the business of Delavan-Bailey. Thereafter the parties reached agreement as to the worth of the Delavan-Bailey assets and the amount Lettman would pay for a 50-percent interest.

The agreement of Berghash and Lettman as to the price of the Delavan-Bailey assets was based upon the taking of an inventory, the valuation of goodwill at the approximate amount of the net profit of the business for the previous year, and the valuation of the store fixtures at their estimated replacement cost.

The amount of investment by Lettman for a 50-percent interest in the business agreed upon between Berghash and Lettman was $25,000. This amount was the maximum amount Lettman felt he was able to raise from savings and borrowings.

Berghash's reason for agreeing in December 1956 to sell a half interest in the Delavan-Bailey business to Lettman was because he felt he could not afford to lose Lettman.

After the parties had reached an agreement Berghash consulted his accountants and lawyer who formulated the method for carrying

out the agreement and prepared a written contract. Berghash had not previously consulted his accountants or lawyer before reaching the agreement with Lettman.

On December 30, 1956, the stockholders of Delavan-Bailey adopted a plan of complete liquidation. The plan provided that all of the assets of the corporation should be distributed in complete liquidation within a 12-month period and that the corporation should be dissolved within such period. The board of directors and officers were authorized to file a certificate of dissolution and, after providing for the liabilities of the corporation, to distribute the remainder of its assets to its stockholders.

On January 29, 1957, Berghash and Lettman entered into a written contract which provided that Delavan-Bailey should forthwith sell to Dorn's its inventory, goodwill, and fixtures. Dorn's was to pay $30,518.59 for the fixtures, $20,000 for the goodwill, and for the inventory at the actual wholesale cost thereof as determined by an inventory made on December 31, 1956. Lettman agreed to purchase 100 shares of the common stock of Dorn's and to pay to that corporation $25,000 therefor in cash. Delavan-Bailey agreed to purchase the remaining 100 shares of the common stock of Dorn's for $25,000, the payment to be made by deducting that amount from the price of the assets purchased by Dorn's. Dorn's was to execute a negotiable promissory note for the balance of the purchase price of the assets. Dorn's was also required to change its name to Delavan-Bailey Drug Co., Inc., and the old company was to be liquidated and dissolved. It was further agreed that Lettman should be employed by Dorn's as manager of its pharmacy at a stated salary and that Berghash should be employed to conduct its bookkeeping and other records at a stated salary. The agreement also provided that if Berghash should become dissatisfied for any reason with the services of Lettman as manager or with his continuance as a stockholder, officer, or director, Berghash would have the right to purchase the stock of Lettman in Dorn's for a price to be determined according to a formula specified in the contract.

Pursuant to the contract executed January 29, 1957, Lettman paid to Dorn's $25,000 cash on January 30, 1957, in payment for 100 shares of the common stock of Dorn's, which thereafter issued the shares to him.

The balance sheet of Delavan-Bailey Drug Co., Inc., as of January 29, 1957, prior to the consummation of the sale contemplated by the contract executed on that date by Berghash and Lettman, was as follows:

### Assets

| | |
|---|---:|
| Cash on hand and on deposit | $58,831.89 |
| Accounts receivable | 3,149.22 |
| Inventories | 70,583.05 |
| Supplies | 463.48 |
| Deposits | 1,150.00 |
| Fixtures (net after depreciation) | 4,300.35 |
| Auto (net after depreciation) | 1,481.88 |
| | 139,959.87 |

### Liabilities and capital

| | |
|---|---:|
| Federal income taxes payable | $13,097.47 |
| Franchise taxes payable | 2,053.19 |
| Capital stock | 2,211.46 |
| Earned surplus | 122,597.75 |
| | 139,959.87 |

On January 29, 1957, Delavan-Bailey sold its fixtures to Dorn's for $30,518.59, its goodwill for $20,000, and its inventory for $70,583.05. Dorn's paid Delavan-Bailey for such fixtures, inventory, and goodwill by delivering its negotiable promissory note dated January 29, 1957, payable to the old corporation in the principal amount of $96,101.64 and by thereafter issuing to Delavan-Bailey 100 shares of its common stock for $25,000 registered in the name of Berghash. The note issued by Dorn's was payable at the rate of $1,000 per month and bore interest at the rate of 6 percent on the unpaid balance. The indebtedness represented thereby was a valid indebtedness.

The adjusted book basis for determining gain or loss to Delavan-Bailey of the assets sold by it to Dorn's as of the date of their sale was as follows: Inventory—$70,583.05; fixtures—$4,300.35; goodwill—zero.

Between January 29, 1957, and May 5, 1957, Delavan-Bailey distributed all of its remaining assets to Berghash in complete liquidation. Delavan-Bailey distributed in liquidation to Berghash and Berghash so received the 100 shares of the common stock of the corporation known as Dorn's, its promissory note in the principal amount of $96,101.64, and cash in the total amount of $49,313.17. The adjusted basis of the petitioners in the capital stock of Delavan-Bailey on the date of its liquidation was $2,211.46. The accumulated earnings and profits of Delavan-Bailey at the date of its liquidation and the distribution of its assets to Berghash were $122,050.11.

Delavan-Bailey was dissolved by the filing of a certificate of dissolution with the Secretary of State of New York on April 23, 1957.

By certificate executed on February 4, 1957, and thereafter filed with the Secretary of State of New York the corporate name of Dorn's was

changed to Delavan-Bailey Drug Co., Inc., and this has since continued to be its corporate name.

At all times from January 29, 1957, to the present time, the corporation originally known as Dorn's and thereafter known as Delavan-Bailey Drug Co., Inc., has carried on the retail drug business theretofore carried on by the old corporation. The drug business was operated by Dorn's without change from the previous operation except that Lettman was a 50-percent owner instead of only a manager.

At all times since January 29, 1957, Berghash and Lettman have each continued to own 100 shares of the common stock of Dorn's and such 200 shares of common stock have constituted all of its issued and outstanding capital stock.

Since January 29, 1957, Lettman has continued his employment as manager of Dorn's.

Berghash has not been dissatisfied with Lettman's services as manager or his continuation as a stockholder, officer, or director of Dorn's, and at no time since January 29, 1957, has he expressed to Lettman any such dissatisfaction.

On their joint income tax return for 1957, Hyman and Rose Berghash reported the gain on the liquidation of Delavan-Bailey as long-term capital gain with gross proceeds of $170,414.81, a cost basis of $2,211.46, and capital gain of $168,203.35.

In his notice of deficiency the respondent determined that as a result of the withdrawal of corporate assets from Delavan-Bailey, petitioners Hyman and Rose Berghash realized dividend income in the amount of $122,050.11, plus long-term capital gain of $48,364.70.

Delavan-Bailey Drug Co., Inc., on its income tax return for the taxable period beginning January 1, 1957, and ending February 28, 1957, reported a long-term capital gain on the sale of its fixtures and goodwill totaling $46,218.24 but claimed that such gain was not recognized because of the applicability of section 337 of the Internal Revenue Code of 1954. Accordingly it did not include any portion of such gain in its taxable income for that period.

In his deficiency notice the respondent determined that long-term capital gain in the amount of $46,218.24 must be included in petitioner's income for the period January 1, 1957, to February 28, 1957.

### OPINION

The respondent's principal contention is that the net result of the transaction in question is the distribution of dividend income by the Delavan-Bailey Drug Co., Inc., to the extent of its current and accumulated earnings and profits in the amount of $122,050.11 as a dividend to Hyman Berghash. The respondent has determined that the

balance of the distribution, less the basis of Berghash in the stock of Delavan-Bailey, constitutes long-term capital gain.

The respondent claims, in the alternative, that in the event we are unable to sustain his principal contention, the liquidating distributions made by Delavan-Bailey Drug Co., Inc., between January 29, 1957, and May 5, 1957, did not constitute a bona fide liquidation of that corporation within the meaning of section 337 of the Code.

The petitioners contend that the series of steps heretofore described in our Findings of Fact amounted to a complete liquidation of the old corporation within the meaning of section 337 of the 1954 Code and that the distributions by Delavan-Bailey on January 29, 1957, are taxable to Hyman and Rose Berghash as long-term capital gain under sections 346(a)(1) and 331(a)(2).

In support of his principal contention that the distribution to Hyman Berghash constituted a dividend distribution, the respondent argues (1) that the transaction was totally lacking in economic substance, and (2), in the alternative, that the consummation of the contract executed by Lettman and Berghash resulted in a nontaxable reorganization within the meaning of section 368(a)(1) of the Code.

With respect to the respondent's argument that the events which took place on or about January 29, 1957, pursuant to the agreement executed by Lettman and Berghash, were sham transactions, it is not entirely clear from the Commissioner's brief whether he is contending that the whole undertaking was lacking in economic substance or that only one step in the overall arrangement constituted a sham.

Nevertheless, in any case, where it is apparent that the corporate entity utilized by the parties to a given transaction is a sham corporation or that the transaction in question otherwise was without economic substance, we are not reluctant to disregard the formalities employed and to reach a result dictated by the substance thereof. *Knetsch* v. *United States*, 364 U.S. 361; *Higgins* v. *Smith*, 308 U.S. 473; *Joseph H. Bridges*, 39 T.C. 1064, affd. 325 F. 2d 180; *Jackson* v. *Commissioner*, 233 F. 2d 289, affirming 24 T.C. 1.

We are convinced from the record that the transaction here under attack was bona fide in every respect, was motivated by business considerations, and that any purpose to minimize income tax liability, if present at all, played only a minor role. From the time when Lettman first contacted Berghash in 1952 it was their purpose and desire to undertake a new venture in the retail drug field on an equal 50–50 basis. Failing in this endeavor, first because of the failure of the Seneca Shopping Plaza project, and later because of the inability of either party to find either a suitable location for the establishment of a new store or an opportunity to purchase an existing store as equal

owners, Lettman finally informed Berghash in 1956 that he intended to leave his position as manager of Delavan-Bailey Drug Co., Inc., and to strike out on his own in a new venture. Lettman informed Berghash that he would only be willing to remain as manager of Delavan-Bailey Drug Co., Inc., if it were possible for him to acquire a 50-percent ownership interest therein. Berghash valued Lettman's ability as manager of the Delavan-Bailey store and finally agreed to sell him a one-half interest in that corporation in order to retain his services.

Lettman and Berghash agreed on the value of the Delavan-Bailey Drug Co., Inc., which on January 29, 1957, had total assets valued at $139,959.87 (plus goodwill valued at $20,000 which did not appear on the balance sheet) and a balance sheet net worth of $124,809.21. Lettman informed Berghash that the very maximum he would be able to afford to invest in a drugstore was $25,000. With such a limited amount of capital, Lettman would have been able to purchase not more than one-fifth of the outstanding stock of the Delavan-Bailey Drug Co., Inc., from Hyman Berghash. Because of the disparity between Lettman's capital of $25,000 and the value of one-half the balance sheet net worth of Delavan-Bailey Drug Co., Inc., which was approximately $62,400, the parties decided to activate Dorn's Drugs, Inc., which had remained in existence as a dormant corporation since 1952 and which had been created for the purpose of owning and operating a new drugstore in the proposed Seneca Shopping Plaza.

Consequently Dorn's Drugs, Inc., agreed to purchase certain operating assets from Delavan-Bailey Drug Co., Inc., in return for a promissory note and one-half the outstanding capital stock of Dorn's. On the day following this transfer of assets, in exchange for 100 shares of stock and a note issued by Dorn's, Lettman purchased the remaining 100 shares of the authorized stock of the new corporation for $25,000 and the old corporation subsequently was completely liquidated. Berghash received the note and one-half the stock of Dorn's Drugs, Inc., as a liquidating distribution from Delavan-Bailey Drug Co., Inc.

Because of the fact that the initial discussions in 1956 related to the possibility of a purchase by Lettman of one-half the stock of Delavan-Bailey, the respondent claims that the real effect of the transaction in question was a sale by Berghash of one-half of his stock in the old corporation to Lettman, and that the transfer of assets by the predecessor corporation to Dorn's Drugs, Inc., should be disregarded as a sham sale. However, because of Lettman's limited capital, it would have been impossible, as pointed out above, for the parties to have carried out their purpose of investing in the store on a 50–50 basis through a sale by Berghash of half the outstanding stock of Delavan-

Bailey. Although it may have been possible to have arranged the same result by causing the old corporation to redeem a portion of Berghash's stock, followed by the issuance of additional shares of Delavan-Bailey to Lettman, this is not what the parties actually did. So long as the transaction was genuine, petitioners had every right to select any method they preferred of achieving a desired result regardless of the tax consequences flowing therefrom. *United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451; *Woodworth* v. *Commissioner*, 218 F. 2d 719, affirming a Memorandum Opinion of this Court; *Zenz* v. *Quinlivan*, 213 F. 2d 914. The note issued by Dorn's Drugs, Inc., was a negotiable promissory note payable at the rate of $1,000 per month, bearing interest at the rate of 6 percent on the unpaid balance, and we find that the debt represented thereby was a valid indebtedness.

Inasmuch as both Delavan-Bailey Drug Co., Inc., and Dorn's Drugs, Inc., were formed for the purpose of conducting business activity and actually engaged in the business of operating a retail drugstore, neither corporation can be regarded as a sham entity. *Moline Properties* v. *Commissioner*, 319 U.S. 436.

It accordingly appears to us that there were excellent business reasons underlying the arrangement agreed upon by Berghash and Lettman, and we are convinced by the record that each of the steps involved possessed economic substance and that no part of the transaction or the net result thereof properly can be viewed as a sham.

The respondent next contends that the transaction in question amounted to a nontaxable reorganization under section 368(a)(1) of the Code. If the transaction can be fitted into one of the definitions of a tax-deferred reorganization specified in section 368(a)(1), section 356(a)(2) [1] could be brought into operation in the event the distributions to Hyman Berghash were found to be equivalent to a dividend. See *Kirschenbaum* v. *Commissioner*, 155 F. 2d 23; *Hawkinson* v. *Commissioner*, 235 F. 2d 747, affirming 23 T.C. 933; *Idaho Power Co.* v. *United States*, 161 F. Supp. 807; *John G. Moffatt*, 42 T.C. 558; *Walter S. Heller*, 2 T.C. 371, aff'd. 147 F. 2d 376, certiorari denied 325 U.S. 868; *James Armour, Inc.*, 43 T.C. 295; *South Texas Rice Warehouse Co.*, 43 T.C. 540.

---

[1] SEC. 356. RECEIPT OF ADDITIONAL CONSIDERATION.

(a) GAIN ON EXCHANGES.—

\*     \*     \*     \*     \*     \*     \*

(2) TREATMENT AS DIVIDEND.—If an exchange is described in paragraph (1) but has the effect of the distribution of a dividend, then there shall be treated as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be treated as gain from the exchange of property.

The respondent first asserts that the arrangement in question amounted to a nontaxable reorganization under section 368(a) (1) (F) of the Code.[2] Section 368(a) (1) describes six types of transactions, of which subparagraph (F) is the sixth, that qualify as tax-free reorganizations. Subparagraph (F) specifies "a mere change in identity, form, or place of organization, however effected.

Although the exact function and scope of the (F) reorganization in the scheme of tax-deferred transactions described in section 368(a) (1) have never been clearly defined, it is apparent from the language of subparagraph (F) that it is distinguishable from the five preceding types of reorganizations as encompassing only the simplest and least significant of corporate changes. The (F)-type reorganization presumes that the surviving corporation is the same corporation as the predecessor in every respect, except for minor or technical differences. *Ahles Realty Corp.* v. *Commissioner*, 71 F. 2d 150, affirming an order of this Court. For instance, the (F) reorganization typically has been understood to comprehend only such insignificant modifications as the reincorporation of the same corporate business with the same assets and the same stockholders surviving under a new charter either in the same [3] or in a different State,[4] the renewal of a corporate charter having a limited life,[5] or the conversion of a U.S.-chartered savings and loan association to a State-chartered institution.[6]

The decisions involving subparagraph (F) or its counterpart in prior revenue acts consistently have imposed at least one major limitation on transactions that have been claimed to qualify thereunder: *if a change in stock ownership or a shift in proprietary interest occurs, the transaction will fail to qualify as an (F) reorganization. Helvering* v. *Southwest Corp.*, 315 U.S. 194, affirming 119 F. 2d 561, affirming a Memorandum Opinion of this Court.

*Helvering* v. *Southwest Corp., supra,* involved a bankruptcy reorganization of the old transferor corporation. Upon completion of the plan of reorganization only 33 percent of the common shareholders of

---

[2] SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.
    (a) REORGANIZATION.—
        (1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

     \*       \*       \*       \*       \*       \*       \*

        (F) a mere change in identity, form, or place of organization, however effected.
[3] *Ahles Realty Corp.* v. *Commissioner*, 71 F. 2d 150.
[4] *George Whittell & Co.*, 34 B.T.A. 1070 ; *Newmarket Manufacturing Co.* v. *United States*, 233 F. 2d 493 ; cf. *Marr* v. *United States*, 268 U.S. 536, in which prior to the enactment of the reorganization provisions the Supreme Court refused to find a nontaxable exchange under the Revenue Act of 1916 in a situation where the General Motors Corp. of New Jersey had reincorporated in Delaware with the same stockholders owning the stock of the new Delaware corporation as had owned the stock of the old New Jersey corporation, and in the same proportions.
[5] See Rev. Rul. 54–269, 1954–2 C.B. 114.
[6] See Rev. Rul. 54–193, 1954–1 C.B. 106.

the bankrupt corporation wound up owning common stock in the surviving corporation. Sixty-seven percent of the transferor's shareholders apparently dropped out. Only 53 percent of the preferred shareholders of the old corporation acquired preferred stock in the new corporation. In denying the taxpayer's contention. that the transaction there in question amounted to a nontaxable reorganization the Supreme Court stated:

and a transaction which shifts the ownership of the proprietary interest in a corporation is hardly "a mere change in identity, form, or place of organization" within the meaning of clause (E).

In *Stollberg Hardware Co.*, 46 B.T.A. 788, a bankruptcy reorganization, in which the former shareholders of the bankrupt corporation acquired only approximately 27 percent of the stock of the survivor, was held not to qualify as "a mere change in identity, form, or place of organization" because of the shift in proprietary interest.

A much less significant change in stock ownership occurred in *Cushman Motor Works* v. *Commissioner*, 130 F. 2d 977, affirming 44 B.T.A. 1288, wherein more than 80 percent of the stockholders of the transferor corporation subscribed for stock in the new corporation and retained their proprietary interests therein. The change in stock ownership resulting from the retirement of less than 20 percent of the shareholders of the predecessor corporation was held to be so substantial as to disqualify the transaction from the tax-free treatment accorded by the predecessor to subparagraph (F) under the Revenue Act of 1934.

In *Joseph C. Gallagher*, 39 T.C. 144, the owners of approximately 62 percent of the stock of the old corporation acquired stock in the successor, whereas the owners of approximately 38 percent of the stock of the predecessor corporation retired. The continuing shareholders acquired approximately 73 percent of the stock of the new corporation, the balance being subscribed by new investors who were key employees of the predecessor. The change in stock ownership on the part of the former owners of the old corporation was held to be too significant a shift in proprietary interest to constitute an (F) reorganization.

The respondent places considerable reliance on our recent decision in *Pridemark, Inc.*, 42 T.C. 510, on appeal (C.A. 4, Sept. 23, 1964). There three corporations that were controlled by the same individual were engaged in the business of selling prefabricated houses. Two were liquidated [7] and distributions of cash and other property were made to its stockholders. Just prior to liquidation a new corporation was formed, the stock of which was issued to the same individual

---

[7] Pridemark and Connecticut, the principal predecessor corporations, were liquidated and dissolved. The *Pridemark* Findings of Fact do not disclose whether or not Crestline, the third corporation, was dissolved.

who had previously controlled the predecessor corporations. Subsequently he contributed to the new corporation a portion of the cash which had been distributed to him in liquidation. He also contributed a lease on certain office premises, together with a trade name "Pridemark" and a business slogan, to the new corporation. The successor corporation continued to operate the same business as its predecessors had conducted and in the same location under the same name.

We there held that the transaction qualified as "a 'mere change in identity, form, or place of organization.'"

Although the fact that the successor corporation in *Pridemark, Inc.*, *supra*, conducted the same business, in the same location, and under the same name as had been conducted by its predecessors is parallel to the situation presented here, we do not understand that decision to hold that an (F)-type reorganization properly encompasses a shift in the proprietary interest of the owners of the transferor corporation. We there pointed out in our opinion that the same individual held voting control over both the predecessor corporations and the surviving corporation, stating:

Immediately before the transfer of said assets, 100 percent interest therein was held by Eugene Blitz as trustee; and immediately after the transfer 100 percent of the stock of the new corporation likewise was owned by him as trustee. And also as regards the equitable ownership of said assets and said stock, both before and immediately after said transactions, all of the same belonged to those persons who had purportedly received the distributions in kind from Pridemark and Connecticut * * *

In the instant case there occurred a drastic shift in the proprietary interest of the owner of the predecessor corporation. Hyman Berghash, who had owned all of the stock (except the two shares owned by his wife) of the old Delavan-Bailey Drug Co., Inc., wound up as the owner of only 50 percent of the stock of the successor corporation. The situation before us, therefore, is distinguishable from *Pridemark, Inc.*, *supra*, on a crucial point. Despite the fact that all of the operating assets were carried over to the successor corporation, which continued exactly the same business, in the same location, as had been conducted by the predecessor, the radical shift in stock ownership which occurred precludes us from holding that the transaction amounted to no more than "a mere change in identity, form, or place of organization" within the meaning of section 368(a)(1)(F). *Cushman Motor Works* v. *Commissioner, supra; Joseph C. Gallagher, supra*.

As an alternative contention, the respondent claims that if we do not find that the transaction in question constitutes an (F) reorganization, then it must qualify as a (D) reorganization.

The requirements of a (D)-type reorganization as pertaining to corporate amalgamations such as the respondent argues is here involved

are set forth in two sections of the Code which Congress has explicitly linked together—section 368 (a) (1) (D) [8] and section 354 (b) (1).[9] In order to qualify as a reorganization under those sections:

(1) There must be a transfer by a corporation of "substantially all" of its assets to another corporation;

(2) Immediately after the transfer the transferor corporation, or one or more of its shareholders, or any combination thereof, must be in control [10] of the transferee; and

(3) All of the remaining property of the transferor as well as all of the stock, securities, and other property acquired by it pursuant to the exchange must be distributed to its shareholders under the plan of reorganization, i.e., there must be a complete liquidation of the transferor.

It is true, as the respondent points out, that the liquidation of a predecessor corporation such as occurred here may represent merely a step incidental to a statutory reorganization. *Survaunt* v. *Commissioner*, 162 F. 2d 753, affirming 5 T.C. 665; *Liddon* v. *Commissioner*, 230 F. 2d 304, modifying on other grounds 22 T.C. 1220; *John G. Moffatt, supra; James Armour, Inc., supra.*

In the situation here presented it is impossible to view the result as a (D) reorganization because of the conspicuous failure of the transaction to qualify under the "control" requirements of subparagraph (D) and section 368(c). Hyman Berghash, who owned 198 out of the 200 outstanding shares of the old corporation (the remaining 2 shares being held by his wife), acquired only 50 percent of the

---

[8] SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.

(a) REORGANIZATION.—

(1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

\* \* \* \* \* \* \*

(D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356;

[9] SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS.

(b) EXCEPTION.—

(1) IN GENERAL.—Subsection (a) shall not apply to an exchange in pursuance of a plan of reorganization within the meaning of section 368(a)(1)(D), unless—

(A) the corporation to which the assets are transferred acquires substantially all of the assets of the transferor of such assets; and

(B) the stock, securities, and other properties received by such transferor, as well as the other properties of such transferor, are distributed in pursuance of the plan of reorganization.

[10] "Control" is defined by section 368(c) to mean "the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation."

outstanding common stock of Dorn's Drugs, Inc., Sidney Lettman owning the balance thereof. Berghash's proportionate share of the voting stock of the successor corporation thus falls far short of the 80 percent necessary to satisfy the "control" requirement of section 368(c) and precludes compliance with the statutory tests set forth under subparagraph (D). *Austin Transit, Inc.,* 20 T.C. 849.

The factual pattern presented here closely resembles the situation that arose in *Joseph C. Gallagher, supra.* There the transferor corporation (Delaware) was engaged in the stevedoring and terminal business serving certain ports on the Pacific coast. It had accumulated earnings and profits exceeding $900,000. The stockholders of Delaware were divided into two groups: (1) Active shareholders, including its officers and directors who held approximately 62 percent of its outstanding stock, and (2) inactive shareholders, consisting of certain estates and widows that held approximately 38 percent of its stock.

For the purposes of eliminating the inactive shareholders from the business, allowing seven or eight key executives to acquire stock interests therein, and permitting two of the larger stockholders to acquire a controlling interest, the active group of shareholders formed a new corporation (California) in 1955. The active shareholders of Delaware acquired approximately 72⅔ percent of the outstanding stock of California, and the balance was subscribed by certain key employees of Delaware. The shareholders of California invested a total of $300,000 in the new corporation for the issuance of its stock.

Shortly thereafter Delaware sold its operating assets to California for approximately $100,000 cash. Delaware was then liquidated and all of its assets in cash and in kind were distributed to its shareholders pro rata. On their income tax returns the shareholders of Delaware reported the liquidating distributions as proceeds from the sale or exchange of their stock.

We there rejected the Commissioner's contention that the transaction amounted to a statutory reorganization. We noted in our opinion in *Gallagher* that the Commissioner specifically disclaimed any contention that there was a (D)-type reorganization involved, possibly because of the fact that only 72⅔ percent of the stockholders of Delaware acquired shares in California.

As stated above, the same fatal defect exists in the respondent's position here.

The respondent seeks to have us find that the requisite control existed in Hyman Berghash by totally disregarding Lettman's purchase of 100 shares of Dorn's common stock as being an unrelated step in achieving the end result. If Lettman's purchase of 100 shares of

common stock of Dorn's could be ignored, Berghash could be regarded as owning 100 percent of the stock of that corporation. But since the obvious purpose of the entire arrangement was to enable Lettman to acquire a one-half interest in the business of Delavan-Bailey and inasmuch as the parties have stipulated that Lettman actually paid Dorn's $25,000 in cash for the issuance of 100 shares of its common stock, it would be impossible on the record before us to disregard as an unrelated step what appears to be the most critical fact and the paramount purpose of the entire transaction.

The second argument advanced by respondent in support of his position that Hyman Berghash actually acquired control of Dorn's Drugs, Inc., within the meaning of section 368(a)(1) (D) and (c), is that the provision in the agreement executed by the parties on January 29, 1957, under which Berghash had a right to purchase the stock of Lettman in the event he should become dissatisfied with his services as manager or his position as a stockholder or an officer in Dorn's, amounted to the beneficial ownership of Lettman's stock. The respondent thus concludes that we should view Berghash as having effective control of 100 percent of the stock of Dorn's.

If Berghash is to be viewed as the beneficial or constructive owner of the stock of Lettman for purposes of determining control under section 368, it is first essential, assuming the provision in question constitutes an option, to determine whether, under some provision of the 1954 Code, the stock of an optionor is attributable to the option holder. Section 318(a)(3) [11] contains a provision requiring in certain situations the attribution of stock ownership to the holder of an option to acquire such stock. However, section 318(a) expressly provides that that section shall apply only "For purposes of those provisions of this subchapter to which the rules contained in this section are expressly made applicable—."

Section 318 is not expressly made applicable to part III of subchapter C which includes section 368 containing the provisions dealing with corporate reorganizations. Consequently, the stock attribution rule of section 318(a)(3) relating to the ownership of stock subject to an option is not applicable to the stock ownership requirement regarding corporate control as defined by section 368(c).

---

[11] SEC. 318. CONSTRUCTIVE OWNERSHIP OF STOCK.

(a) GENERAL RULE.—For purposes of those provisions of this subchapter to which the rules contained in this section are expressly made applicable—

\* \* \* \* \* \* \*

(3) OPTIONS.—If any person has an option to acquire stock, such stock shall be considered as owned by such person. For purposes of this paragraph, an option to acquire such an option, and each one of a series of such options, shall be considered as an option to acquire such stock.

It is clear from the record that Berghash has continued to be satisfied with Lettman's services as manager and his position as a stockholder in Dorn's Drugs, Inc., and that the option, assuming one exists, has never been exercised. The existence of an unexercised option has been held to be of no consequence in determining control for corporate reorganization purposes. *Commissioner* v. *National Bellas Hess*, 220 F. 2d 415, affirming 20 T.C. 636. We are unable to find from the record any reason for regarding it differently here.

In view of the foregoing, with respect to the stockholders of Delavan-Bailey, we hold that the liquidating distributions of that corporation constituted "a series of distributions in redemption of all of the stock of the corporation pursuant to a plan" within the meaning of section 346(a)(1)[12] of the Code and are thus taxable to them as long-term capital gain under the provisions of section 331(a).[13] *Joseph C. Gallagher, supra.*

In the absence of a nontaxable reorganization under section 368 (a)(1), it is the respondent's final contention that for purposes of determining the applicability of section 337 of the Code [14] there was no complete liquidation of the predecessor corporation within the meaning thereof. He contends that this is so because of the fact that the successor corporation continued to operate exactly the same drugstore, under the same name, and in the same location as previously had been conducted by the old corporation. The respondent claims, without the citation of any authority, that section 337 can apply only where a bona fide termination of the business of the liquidating corporation has occurred.

---

[12] SEC. 346. PARTIAL LIQUIDATION DEFINED.

    (a) IN GENERAL.—For purposes of this subchapter, a distribution shall be treated as in partial liquidation of a corporation if—

        (1) the distribution is one of a series of distributions in redemption of all of the stock of the corporation pursuant to a plan; * * *

[13] SEC. 331. GAIN OR LOSS TO SHAREHOLDERS IN CORPORATE LIQUIDATIONS.

    (a) GENERAL RULE.—

        (1) COMPLETE LIQUIDATIONS.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock.

        (2) PARTIAL LIQUIDATIONS.—Amounts distributed in partial liquidation of a corporation (as defined in section 346) shall be treated as in part or full payment in exchange for the stock.

[14] SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS.

    (a) GENERAL RULE.—If—

        (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and

        (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,

then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.

The parties have stipulated that "Between January 29, 1957 and May 5, 1957, Delavan Bailey distributed all of its remaining assets to Berghash in complete liquidation." The stipulation of facts further states that Delavan-Bailey was dissolved by the filing of a certificate of dissolution with the secretary of state of New York, on April 23, 1957. There is therefore no question whatever but that as a matter of fact the old corporation was completely liquidated.

We are unable to find any authority or any indication from the legislative history of section 337 that would require us to disregard the actual liquidation and dissolution of Delavan-Bailey. The same question was raised by the Commissioner in *Joseph C. Gallagher*, *supra*, and in response thereto we stated as follows:

Respondent would have us hold here that the liquidation of Delaware was not a liquidation, although it literally complied with all the terms, because the transaction is alleged to have been primarily a vehicle for the distribution of undistributed earnings. But, unlike the reorganization sections which were involved in *Bazley* and similar cases, liquidation is usually accompanied by some kind of distribution which may well include accumulated earnings of the liquidating corporation. *Hellmich* v. *Hellman, supra*. That this is recognized by the statutory provisions themselves seems to us to permit of no uncertainty.[18] * * *

* * * * * * *

Congress intended that in this situation, any redemption could not be treated as essentially equivalent to a dividend, and that this problem of the continuation of a business must be dealt with, if at all, under the reorganization sections. Since these facts do not fall within the careful language of those sections, the distributions should be treated as payment in exchange for the stock. * * * [Footnote omitted.]

On December 30, 1956, Delavan-Bailey Drug Co., Inc., adopted a plan of complete liquidation. In a series of distributions to its stockholders occurring between January 29, 1957, and May 5, 1957, all of its assets were distributed in complete liquidation. No assets were retained for the purpose of meeting outstanding claims. The sale by the old corporation of its inventory, fixtures, and goodwill to Dorn's Drugs, Inc., took place on January 29, 1957. Thus, all of the liquidating sales and distributions took place within the 12-month period beginning on the date of the adoption of the plan of complete liquidation and the transactions complied with the requirements of section 337. We therefore hold that no gain or loss is recognizable to Delavan-Bailey Drug Co., Inc., as a result of the sale in question.

*Decisions will be entered for the petitioners.*