Lovell and Hart, Inc. v. Commissioner.
Lovell & Hart, Inc. v. Commissioner
Docket No. 3876-68.
United States Tax Court
T.C. Memo 1970-335; 1970 Tax Ct. Memo LEXIS 24; 29 T.C.M. (CCH) 1599; T.C.M. (RIA) 70335; December 8, 1970, Filed Charles R. Hembree, Central Bank Bldg., Lexington, Ky., for the petitioner. Robert A. Roberts, for the respondent. RAUM
Memorandum Findings of Fact and Opinion
*25 The Commissioner determined a deficiency of $56,329.39 in the income tax of Lovell and Hart, Inc., for the taxable year ending February 28, 1965. The only issue remaining for decision is whether Lovell and Hart, Inc., received "other property" within the meaning of section 351(b), I.R.C. 1954, in connection with its transfer of property to Watts and Call Construction Company, Inc., during the taxable year ended February 28, 1965. Findings of Fact The parties have filed a stipulation of facts which, together with the attached exhibits, is incorporated herein by this reference. Petitioner, Lovell and Hart, Inc., is a corporation organized under the laws of the Commonwealth of Kentucky in March 1954. At the time the petition in this case was filed, its principal place of business was located in Lexington, Kentucky. Petitioner filed its Federal corporate income tax return for the taxable year ended February 28, 1965, with the district director of internal revenue at Louisville, Kentucky. During that year petitioner's officers and stockholders were as follows: Name
Title
Number ofShares Held
PercentageOwnership
William M. Hart
President
307 1/2
25%
C. B. Lovell, Jr.
Secretary-Treasurer
307 1/2
25%
Emette Hart
Vice-President
410
33 1/3%
Harold C. Watts
Vice-President
61 1/2
5%
C. B. Lovell III
61 1/2
5%
C. D. Call
41
3 1/3%
F. H. Hawley
41
3 1/T 1600
Prior to January 1965, petitioner's principal business was the construction of roads and highways for the Kentucky Department of Highways. While petitioner owned some of the road-building equipment which it used in its operations, it also leased equipment from Lexington Equipment Rental Company ("Lexington"). The lease between petitioner and Lexington governing the year beginning March 1, 1964, provided in part as follows:
Lessor, Lexington Equipment Rental Co., hereby proposes to lease and does lease to Lessee, Lovell and Hart, Inc., for a period of one year or more the following Equipment:
Euclid Trucks, Tractor Scrapers, Trailers, Automobiles, Pickups, Flat Trucks Compressors, Cranes, Shovels, Drills, Tractors, Scrapers, Radio with Mobile Units, Welders, Rollers, Graders, Pumps, Pile Hammer, Loaders, or any other Equipment lessor may have to rent. Rental Rates to be governed by AED Rates compiled by Associated Equipment Distributors.
The Lessee agrees to maintain and keep in repair Machinery and Equipment in the same condition as when delivered to it by Lessor, usual wear and tear excepted.
Lexington (formerly Lovell and Hart Construction Company) was a partnership engaged principally in leasing construction equipment. Its partners and their respective capital accounts in the partnership on March 1, 1964, were as follows: *26 Capital
Per-
Partner
Account
centage
W. M. Hart
$36,279.92
25%
C. B. Lovell, Jr
29,051.00
20%
Emette Hart
41,127.39
28%
Harold C. Watts
7,256.01
5%
C. B. Lovell, III
14,491.69
10%
C. D. Call
4,837.37
3%
F. H. Hawley
4,830.58
3%
C. W. Hart
7,245.86
5% Prior to February 28, 1965, petitioner was Lexington's principal customer, and each enterprise was located at the same address: 1429 New Circle Road, N.E., in Lexington. In addition to construction equipment, petitioner also owned the building and real estate where its offices were located and where it parked its equipment. Aside from its officers and shareholders, petitioner had approximately six or seven permanent employees, who generally held supervisory positions. The majority of petitioner's employees were temporary employees who were hired through labor unions and paid on an hourly basis. At all times pertinent herein, the Kentucky Department of Highways (the "Highway Department") awarded highway construction contracts on the basis of a competitive bidding procedure. In order to be permitted to submit a bid on a highway construction contract, the contractor had to first be "prequalified" *27 and issued a certificate of eligibility by the Highway Department. The certificate of eligibility was effective for only one year, and contractors therefore had to prequalify annually. The prequalification procedure was designed to enable the Highway Department to determine the maximum amount of work a contractor was capable of performing at one time and to identify the types of highway work the contractor was able to perform. Each applicant for a certificate of eligibility was required to submit with its application a certified financial statement. On the basis of the financial statement, the Highway Department determined the applicant's "maximum financial capacity." That amount was then multiplied by the sum of several percentage figures, which, during 1964, represented the Highway Department's evaluation of the applicant's organization (for which the maximum rating was 20 percent), plant and equipment (maximum rating: 40 percent), and past performance (maximum rating: 40 percent). The maximum total percentage rating was thus 100 percent. The result of the foregoing computation determined the maximum amount of incomplete work which the contractor was permitted to have at one time *28 under its certificate of eligibility. On May 27, 1964, the Highway Department issued petitioner a certificate of eligibility in the amount of $4,909,896. The Highway Department awarded highway construction contracts to the lowest "responsible" bidder for each contract. In 1601 order to be considered a "responsible" bidder, the contractor had to be prequalified to perform the particular type of job for which the contract in question was to be awarded and the amount of the bidder's certificate of eligibility had to be large enough to permit it to take on the contract. During November and December of 1964, Harold Watts ("Watts") and C. D. Call ("Call"), two of petitioner's minority stockholders, discussed the possibility of leaving petitioner and entering into the highway construction business on their own. They subsequently raised this possibility with petitioner's other stockholders. C. B. Lovell, Jr., had suffered a heart attack and had consequently reduced his active participation in petitioner's affairs; and petitioner's other two principal stockholders, Emette Hart and W. M. Hart, indecated their desire to slow down their activities as well. The three major stockholders *29 ultimately agreed that if Watts and Call formed a new construction firm, they would help the new enterprise to get started and cause petitioner to terminate its construction work. It was further agreed that petitioner would redeem the stock of its smaller stockholders: Watts, Call, C. B. Lovell III, and F. H. Hawley. Accordingly, on December 28, 1964, Watts and Call Construction Company, Inc. ("Watts & Call") was incorporated under the laws of the Commonwealth of Kentucky. Its Articles of Incorporation provided in part as follows: ARTICLE II. The nature of the business and purposes of the corporation to be promoted, transacted and carried on shall be as follows: To carry on and conduct a general contracting and construction business, including the planning, designing, contracting, enlarging, preparing, removing or otherwise engaging in any work upon buildings, manufacturing plants, residential structures and appurtenances, roads, highways, bridges, and all iron, steel, wood, masonry and earth construction; to receive and undertake any and all contracts and assignments of contracts therefor, or in relation thereto; to manufacture and furnish all building materials and supplies *30 connected therewith; to prepare specifications of and for buildings, bridges and any other structures whatever; * * * ARTICLE IV. The address of the registered office of the corporation shall be 1429 New Circle Road NE, Lexington, Kentucky, and the name and address of its registered agent shall be C. D. Call, 1429 New Circle Road NE, Lexington, Kentucky. Said office of the corporation and the identity and address of the registered agent may be changed from time to time as circumstances may require, in which event due notice shall be furnished to the Secretary of State. * * * ARTICLE VI. The name and address of the incorporator is Lovell & Hart, Inc., 1429 New Circle Road NE, Lexington, Kentucky, and the number of shares subscribed by it is ten. An "organization meeting" of Watts & Call was held on January 3, 1965. At the meeting, W. M. Hart, Emette Hart, Charles B. Lovell, Jr., Watts, and Call were elected directors. On the same day, at a meeting of the directors, Watts was elected president and Call was elected secretary and treasurer of the new enterprise. At some time prior to February 28, 1965, petitioner transferred all of its construction equipment to Watts & Call, *31 along with $50 in cash. The equipment then had an adjusted basis of $73,087.07, but was transferred to Watts & Call at a value of $145,650. The value of $145,650 was determined to be the equipment's fair market value by Watts, Emette Hart, C. B. Lovell, and W. M. Hart during November and December of 1964, and was also used for the purpose of valuing petitioner's capital stock when the stock held by the outgoing shareholders was redeemed. In what was at least partial payment for the equipment and the cash, Watts & Call issued petitioner a stock certificate dated January 4, 1965 for 1,457 shares of its stock. A special meeting of the Board of Directors of Watts & Call was held on February 26, 1965, and the minutes of that meeting read in part as follows: The Chairman, Mr. H. C. Watts, advised the directors that in connection with the transfer of equipment to this Corporation, it was necessary for the Board to authorize the issuance of the following notes, each due thirteen months after date of February 26, 1965, and bearing interest at the rate of six per cent per annum: C. B. Lovell, Jr
$24,306.04
C. B. Lovell, III
21,317.54
F. H. Hawley
3,376.42
F. H. Hawley
10,939.56
*32 1602 It was moved, seconded and passed by unanimous vote that the above notes be issued by the Corporation. The notes to which the minutes referred were delivered to the parties mentioned above during the taxable year ending February 28, 1965. On or about February 26, 1965, Watts & Call also sold 110 shares of its stock to petitioner for $11,000. On February 27, 1965, the following entries were made on the books of Watts & Call: 1965
General Journal Opening Entries
1
2
Feb. 27
Equipment (Basis for Depreciation $73,087.07)
$145,650.00
Capital Stock
$145,650.00
To record Capital Stock issuance to Lovell and Hart, Inc. for Equipment
Cash
49,000.00
Goodwill
161,439.56
Capital Stock:
W. M. Hart
27,600.00
H. C. Watts
61,400.00
C. D. Call
21,500.00
Ernest Gatson
6,200.00
C. W. Hart
33,800.00
Note Payable (13 Mo. 6%):
C. B. Lovell, Jr.
24,306.04
C. B. Lovell, III
21,317.54
F. H. Hawley
3,376.42
F. H. Hawley
10,939.56
To record Capital Stock and Notes issued
Cash
11,000.00
Capital Stock - Lovell & Hart, Inc.
11,000.00
To record Stock sold to Lovell & Hart, Inc.
Cash
50.00
Capital Stock - Lovell & Hart, Inc.
50.00
To record balance of payment of stock - this deposit was made prior to 2/26/65
*33 The outstanding stock of Watts & Call, as of February 26, 1965, was held as follows: Shareholder
Number ofShares
Percentage Ownership
Lovell and Hart, Inc.
1,567
51%
W. M. Hart
276
9%
Harold C. Watts
614
20%
C. D. Call
215
7%
C. W. Hart
338
11%
Ernest Gatson, Jr.
62
2%
On or about February 26, 1965, petitioner redeemed the stock held by its four smaller stockholders. As a result, W. M. Hart owned 30 percent of petitioner's stock; Emette Hart owned 40 percent; and C. B. Lovell, Jr., owned the remaining 30 percent. After petitioner transferred its construction equipment to Watts & Call in early 1965, it terminated its construction activities. In addition, petitioner leased to Watts & Call the building and real estate where its office had been located and where its construction equipment had been kept. The property was subsequently used for the same purposes by Watts & Call. Furthermore, after petitioner terminated its construction business, all or nearly all of its permanent employees became employees of Watts & Call. Thereafter, petitioner's only business activity consisted of holding real estate for investment purposes. On or about March 1, 1965, a *34 lease was executed by Lexington and Watts & Call, which was substantially identical to the lease between Lexington and petitioner, dated March 1, 1964. As a result, Watts & Call replaced petitioner as Lexington's principal customer. Watts & Call's primary business was the same as that previously engaged in by petitioner: the construction of highways under contracts awarded by the Kentucky Department of Highways. During 1965, Watts & Call applied for a certificate of eligibility from the Highway Department. The Department awarded it a certificate of eligibility in the amount of $2,603,789, which was some $2,300,000 less than petitioner's most recent certificate. The $2,603,789 amount was based upon a "maximum financial capacity" of approximately $3,719,700 and a 1603 70 percent rating. The 70 percent figure was based upon the following percentage ratings: [1]
Category
Maxi- mumrating
Ratinggiven toWatts &Call
Organization
20%
10%
Construction Experience
20%
20%
Performance
30%
20%
Plant and Equipment 30%
20%
100%
70%
*35 The ten percent rating given Watts & Call for "Organization" was the same rating the Highway Department customarily awarded to a new contractor. However, because the prequalification committee was already familiar with the individuals who had left petitioner to organize and operate Watts & Call, the new firm was not treated as a new contractor for purposes of all of the categories. Thus, Watts & Call was given the maximum rating for "Construction Experience," and although a new contractor was ordinarily given a rating of one-half of the maximum for "Performance," Watts & Call was given two-thirds of the maximum rating. In order to obtain the maximum rating for "Plant and Equipment" a contractor was required to own all the equipment needed to perform the type of work for which prequalification was sought. However, some credit was given for leased equipment which was readily available to the applicant, and as a result of its lease agreement with Lexington, together with the equipment it owned directly, Watts & Call received a 20 percent rating for "Plant and Equipment." In awarding the 20 percent rating, the chairman of the Highway Department's prequalification committee interpreted *36 Watts & Call's lease agreement with Lexington to ensure that all of Lexington's equipment would be available for the use of Watts & Call at any time during the period covered by the lease. In subsequent years Watts & Call was able to increase the amount of its certificate of eligibility to approximately $5,000.000. At some time after February 26, 1965 the partners in Lexington realigned their interests in the partnership. The capital accounts of Lexington's partners, as reflected on its Federal income tax returns for the years ending February 28, 1965, and February 28, 1966, were as follows: Feb. 28,1965
Feb. 28,1966
PercentageFeb. 281966
W. M. Hart
$75,337.49
$75,246.15
24%
C. B. Lovell, Jr
70,335.32
47,823.25
15%
Emette Hart
85,392.67
54,310.72
18%
H. C. Watts
15,067.52
61,015.82
20%
C. B. Lovell III
29,789.81
587.54
.2%
C. D. Call
10,045.04
21,448.59
7%
C. W. Hart
15,057.37
42,981.36
14%
Ernest Gatson
6,072.20
2% Thus, at least as of February 28, 1966, their capital accounts in Lexington were roughly proportionate to their interests in Watts & Call. The proportionality is closer when petitioner's holdings in Watts *37 & Call are attributed pro rata to its three stockholders, W. M. Hart, Emette Hart, and C. B. Lovell, Jr. The correlation between the interests in the two enterprises is even closer when all of the Harts' interests and all of the Lovell's interests are each considered as a unit. In his statutory notice of deficeincy, dated May 13, 1968, the Commissioner determined that petitioner realized a gain, taxable to the extent of $137,634.96 under section 351, I.R.C. 1954, from the transfer of property to Watts & Call. The deficiency notice stated that the determination was based on the following transactions: (1) Capital stock issued by Watts and Call Construction Company to your shareholders, W. M. Hart, H. C. Watts, C. D. Call and C. W. Hart, in exchange for goodwill transferred by you. (2) Notes of Watts and Call Construction Company issued to your shareholders, C. B. Lovell, Jr., C. B. Lovell III and F. H. Hawley, totaling $59,939.56 in connection with the transfer of the equipment. Therefore, this portion of the gain is taxable as ordinary income within the meaning of Section 1245 of the Internal Revenue Code. Notes of shareholders *38 of Watts and Call Construction Company issued to your shareholders, Emette Hart, W. M. Hart and C. B. Lovell, Jr., totaling $77,695.40, in connection with the transfer of the intangible asset, goodwill. This portion of the gain is taxable as a long term capital gain. On or about June 20, 1969, a special meeting of the board of directors of Watts & 1604 Call was held. The minutes read in part as follows: Mr. Wm. M. Hart advised that it had been brought to his attention that the minutes of a special meeting of the Board of Directors held at the office of Robert Houlihan on February 26, 1965, had been incorrectly transcribed and recorded in the Corporate Minute Book. After a discussion, it was moved, seconded and passed by unanimous vote that the minutes of the meeting of February 26, 1965, should be corrected as follows: ORIGINAL MINUTES READ: " The Chairman, Mr. H. C. Watts, advised the directors that in connection with the transfer of " CORRECTED MINUTES TO READ: " The Chairman, Mr. H. C. Watts, advised the directors that in connection with the preferential leasing of " At the trial herein, the Commissioner conceded that petitioner did not recognize gain from the issuance *39 of notes by shareholders of Watts & Call to Emette Hart, W. M. Hart, and C. B. Lovell, Jr. However, he continues to take the position that the $59,939.56 in notes issued by Watts & Call represented part of the consideration paid for the assets transferred to Watts & Call by petitioner (just as though such notes had been issued directly to petitioner and then distributed by it to the payees - i.e., that the notes were constructively received by petitioner), and that the gain upon such transfer is taxable to the extent of those notes under section 351(b), I.R.C. 1954; but he no longer seeks to identify such gain with depreciable assets (equipment) to be taxed as ordinary income by reason of section 1245, as originally determined by him, and he has conceded that the gain is taxable only as capital gain. Opinion RAUM, Judge: Subsection (a) of section 351, I.R.C. 1954, [2] provides for nonrecognition of gain or loss "if property is transferred to a corporation * * * by one or more persons solely in exchange for stock or securities in such corporation *40 and immediately after the exchange such person or persons are in control * * * of the corporation." However, subsection (b) (1) of section 351 provides that if subsection (a) would apply to a transaction but for the fact that other property or money is received in addition to the stock or securities permitted to be received under subsection (a), then any gain to the recipient of such other property or money shall be recognized. [3]
*41 The controversy herein concerns the application of section 351 to a series of transactions involving the transfer of petitioner's construction business to Watts & Call, a new corporation. The business was transferred in order to enable petitioner's smaller stockholders, who held larger interests in Watts & Call, to increase their interests in the construction enterprise. Petitioner had previously rented construction equipment from Lexington, a partnership; and petitioner's stockholders had held interest in Lexington which were approximately proportionate to their interests in petitioner. Accordingly, the transfer of the construction business was accompanied by a realignment of interests in the partnership in accordance with the stockholders' interests in the newlyformed corporation. There is no dispute between the parties with regard to the applicability of many of the requirements of section 351 to the exchange between petitioner and Watts & Call. Both parties agree that petitioner's assets were transferred, at least in part, in exchange for the stock of Watts & Call, and that immediately after the exchange petitioner "controlled" Watts & Call. [4] Their disagreement 1605 concerns *42 only whether in the exchange of its assets for the stock of Watts & Call, petitioner also received, actually or constructively, "other property" which would call for the application of the recognition provisions of subsection (b)(1). The alleged "other property," to which the controversy relates, are four notes issued by Watts & Call to C. B. Lovell, Jr., C. B. Lovell III, and F. H. Hawley, in the aggregate amount of $59,939.56. Their issuance was reported on the books of Watts & Call as follows: Cash
$ 49,000.00
Goodwill
161,439.56
Capital Stock:
W. M. Hart
$27,600.00
H. C. Watts
61,400.00
C. D. Call
21,500.00
Ernest Gatson
6,200.00
C. W. Hart
33,800.00
Note Payable (13 mo. 6%):
C. B. Lovell, Jr
24,306.04
C. B. Lovell III
21,317.54
F. H. Hawley
3,376.42
F. H. Hawley
10,939.56
To record Capital Stock and Notes issued
The Commissioner contends that the notes were issued *43 by Watts & Call in connection with the transfer of petitioner's construction business. The record, considered as a whole, supports his position. The Commissioner relies primarily upon the minutes of a special meeting of the board of directors of Watts & Call, held on or about February 26, 1965, which stated that the notes were issued "in connection with the transfer of equipment" from petitioner. The Commissioner's position also finds support in the high percentage ratings initially given to Watts & Call by the Highway Department for "Construction Experience" and "Performance." Watts & Call received the maximum rating of 20 percent for "Construction Experience" and a 20 percent rating (two-thirds of the maximum rating) for "Performance." At the trial herein, William D. Judy, who served as chairman of the Highway Department's prequalification committee when the initial ratings were awarded to Watts & Call, explained the high ratings: So usually where there is no performance record, we rate a new contractor at * * * half the maximum rating. In this particular instance * * * we gave some credit for having known the people, the individuals that formed the company and were going to operate *44 the company. It wasn't an entirely new outfit to us. * * * [The] organization received a full 20-per-cent rating on construction experience because of the experience of the principal officer * * * The individuals, the years of experience, and the complement of the principal officers warranted - satisfied the Department that they had the capacity, individual capacity to do satisfactory work. The "package" of trained and experienced employees was obviously of considerable value to Watts & Call; and that value was not reflected in the fair market value of the individual pieces of construction equipment in exchange for which Watts & Call had issued its stock. Cf. John G. Moffatt, 42 T.C. 558, 579, affirmed, 363 F. 2d 262 (C.A. 9), certiorari denied, 386 U.S. 1016. We think it evident that petitioner transferred to Watts & Call a certain amount of its organizational earning power, its value as a "going concern" over and above the value of the individual items of construction equipment, and that the notes were issued in exchange for it. At the trial herein, petitioner presented Harold C. Watts, the president of Watts & Call, in support *45 of its theory that the notes were issued in connection with the readjustment of partnership interests in Lexington. Watts testified that at the time of the realignment in partnership interests, Watts & Call entered into a transaction with Lexington or its partners. He testified that the various amounts owing as the result of the two transactions were subsequently "netted out" and that the notes here in question were issued by Watts & Call to three of Lexington's partners in order to reflect its obligations as determined by the "netting out" process. However, his testimony was vague and elusive. He offered four different explanations of the alleged transaction between Watts & Call and Lexington or its partners. He suggested that the notes were issued in return for "preferential leasing agreements" [5] from Lexington, for "cash and possibly 1606 some of the 'good will'" of Lexington, for the agreement of Lexington's partners to endorse indemnity and performance bonds, and in return for loans from the three recipients of the notes. The record offers little support for any of these explanations. Watts' testimony was vague and not nearly as specific as would be expected of an account *46 of a transaction involving some $59,000. The "corrected" minutes of the special meeting of the board of directors of Watts & Call, which petitioner offered to establish the connection with the purported preferential leasing agreement, are entitled to little weight; the "correction" was not entered until four years after the date of the meeting and a year and one-half after the Commissioner had issued the deficiency notice in this case. Moreover, since the stockholders in Watts & Call held approximately proportionate interests in Lexington, a preferential leasing agreement would seem to have been a superfluity, at best. In any event, petitioner has offered no convincing explanation of why it was deemed necessary. Nor has petitioner attempted to explain why it had not entered into such an agreement when it operated the construction business, or why, if it had entered into one, it did not transfer the agreement directly to Watts & Call. [6]
*47 Petitioner has failed to persuade us that the notes were issued in connection with a transaction with Lexington. There is ample support for the Commissioner's position that the notes were issued in connection with the transfer of petitioner's construction business to Watts & Call, and we sustain it. Although petitioner never physically received the notes in question, petitioner's transfer of its business to Watts & Call was the very reason for the issuance of the notes. In substance, the notes came to Hawley and the Lovells through petitioner, and it is therefore of little significance that the notes were issued directly to petitioner's stockholders, rather than first issued to petitioner and then assigned to the stockholders. Cf. George R. Tollefsen, 52 T.C. 671, 681, affirmed 431 F. 2d 511 (C.A. 2). Petitioner has contended that since the Commissioner relied upon section 1245 in his deficiency notice and since he no longer relies upon that section, the burden of proof now rests upon the Government. Petitioner urges that we should disapprove the Commissioner's determination on the basis of his failure to carry his burden of proof. We disagree on two *48 grounds. First, regardless of which party has the burden of proof, we think that the record supports the Commissioner's determination. Secondly, we think that the burden of proof was on the petitioner in this case. In his notice of deficiency, the Commissioner determined that the notes had been issued in connection with petitioner's transfer of equipment to Watts & Call, that the notes, although issued to individual stockholders, were constructively received by petitioner and hence were taxable pursuant to the provisions of section 351, and that, to the extent of the gain recognized, the notes were taxable at ordinary income rates pursuant to section 1245, I.R.C. 1954. At the trial herein, the Commissioner conceded that the notes were taxable at the more favorable capital gain rates. However, he continued to rely upon section 351(b)(1) as the authority for his determination that petitioner was taxable on the notes. The central question in this case - whether the issuance of the notes called for the application of the recognition provisions of section 351(b)(1) - thus remained unchanged. The effect of the concession was simply to settle the issue of the applicable *49 rate of tax favorably to the taxpayer. If that issue had been so resolved as the result of judicial decision, petitioner would still be subject to the burden of proof with regard to the issue of what, if anything, should be taxed, and the fact that the Commissioner conceded the issue does not alter this result. Cf. William O'Dwyer, 28 T.C. 698, 705 (acq. 1958-2 C.B. 6), affirmed 266 F. 2d 575 (C.A. 4). This is not a case where the Commissioner relies upon a new theory and the new theory results in an increased deficiency. See Rozelle McSpadden, 50 T.C. 1607 478, 493. Rather the Commissioner favorably conceded an issue to the petitioner, thereby reducing the deficiency, and then relied only upon section 351, which he had originally cited in his deficiency notice as authority for taxing the notes in question. Decision will be entered under Rule 50. Footnotes
1. In 1965 the Highway Department used a rating system which differed in some respects from the system it had used the year before.↩
2. SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR. (a) General Rule. - No gain or loss shall be recognized if property is transferred to a corporation (including, in the case of transfers made on or before June 30, 1967, an investment company) by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property. (b) Receipt of Property. - If subsection (a) would apply to an exchange but for the fact that there is received, in addition to the stock or securities permitted to be received under subsection (a), other property or money, then - (1) gain (if any) to such recipient shall be recognized, but not in excess of - (A) the amount of money received, plus (B) the fair market value of such other property received; and (2) no loss to such recipient shall be recognized. ↩
3. Recognizable gain is limited by section 351 (b)(1)(A) and (b)(1)(B)↩ to the amount of money received plus the fair market value of other property received.
4. Although the record does not make it altogether clear that petitioner "controlled" Watts & Call at the time the construction equipment was transferred, the parties appear to agree that it did, and we accept this for the purposes of this case.↩
5. The purported agreement gave Watts & Call a first option to rent whatever equipment Lexington owned. According to Watts' testimony, the agreement was a purely oral understanding and supplemented the written lease agreement between Lexington and Watts & Call, which pertained only to the type of equipment and rental rate. ↩
6. Petitioner also offered the testimony of William D. Judy in support of its case, but the implications of his testimony are not altogether favorable to petitioner's position. Judy testified that he, as chairman of the Highway Department's prequalification committee, interpreted the written lease to grant Watts & Call a first option to rent all of Lexington's construction equipment. If the written agreement did grant a first option, it is difficult to understand why Watts & Call paid some $59,000 in return for a redundant oral promise. On the other hand, if an additional agreement had been necessary to guarantee Watts & Call a preferential status, Judy's testimony certainly offers no support for the existence of such agreement.↩